Warner JACKSON, Jennifer Evans, Wendell Harris, The
Reverend Andrew Kennedy, Rabbi Isaac Serotta, Ceil
Ann Libber, Father Thomas J. Mueller, Reverend
John N. Gregg, Diane Brewer, Colleen Beaman, Mary
Morris, Penny Morse, Kathleen Jones and Philip
Jones, Plaintiffs-Respondents,

v.

John T. BENSON, Superintendent of Public Instruction,
Department of Public Instruction and James E. Doyle,
Defendants-Appellants,†

Marquelle MILLER, Cynthia Miller, Angela Gray,
Zachery Gray, Shon Richardson, George Richardson,
Latrisha Henry, Faye Henry, Reigne Barrett, Valerie
Barrett, Candice Williams, Senton Williams, Clintrai
Giles, Sharon Giles, Parents For School Choice, Pilar
Gonzalez, Dinah Cooley, Julie Vogel, Kate Helsper,
Blong Yang, Gail Crockett, Yolanda Lassiter and
Jeanine Knox, Intervenors-Defendants-Appellants. †

MILWAUKEE TEACHERS' EDUCATION ASSOCIATION, by its
President, M. Charles Howard, Michael Lengyel,
Donald Lucier, Tracy Adams, Milwaukee Public
Schools Administrators and Supervisors Council, Inc.,

†Petition to review granted.

1

by its Executive Director, Carl A. Gobel, People for the American Way, by its Executive Vice President and Legal Director, Elliott M. Minceberg, John Drew, Susan Endress, Richard Riley, Jeanette Robertson, Vincent Knox, Bertha Zamudio, James Johnson, Robert Ullman and Sally F. Mills, Plaintiffs-Respondents,

v.

John T. BENSON, Superintendent of Public Instruction, Department of Public Instruction and James E. Doyle, Defendants-Appellants,†

Marquelle MILLER, Cynthia Miller, Angela Gray, Zachery Gray, Shon Richardson, George Richardson, Latrisha Henry, Faye Henry, Reigne Barrett, Valerie Barrett, Candice Williams, Senton Williams, Clintrai Giles, Sharon Giles, Parents For School Choice, Pilar Gonzalez, Dinah Cooley, Julie Vogel, Kate Helsper, Blong Yang, Gail Crockett, Yolanda Lassiter and Jeanine Knox, Intervenors-Defendants-Appellants.

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, Felmers O. Chaney, Lois Parker, on behalf of herself and her minor child, Rashaan Hobbs, Derrick D. Scott, on behalf of himself and his minor children, Deresia C.A. Scott and Desmond L.J. Scott, Constance J. Cherry, on behalf of herself and her

† Petition to review granted.

2

■■■■■■■■■

minor children, Monique J. Branch, Monica S. Branch, and William A. Branch, Plaintiffs-Respondents,

v.

John T. BENSON, Superintendent of Public Instruction of Wisconsin, in his official capacity, Defendant-Appellant.†

Court of Appeals

*No. 97–0270. Oral argument July 22, 1997.—Decided August 22, 1997.*

(Also reported in 570 N.W.2d 407.)

†Petition to review granted.

4

On behalf of the defendants-appellants, John T. Benson, et al., the cause was submitted on the briefs of *Jay P. Lefkowitz, Theodore W. Ullyot* and *Paul D. Clement* of *Kirkland & Ellis* of Washington, D.C. and *Edward S. Marion* of *Murphy & Desmond, S.C.* of Madison. Oral argument by *Edward S. Marion.*

On behalf of the intervenors-defendants-appellants, Marquelle Miller, et al., the cause was submitted on the briefs of *Lauren Brown-Perry* of *Hicks & Brown-Perry Law Office, S.C.* of Madison and *Richard P. Hutchison* of *Landmark Legal Foundation* of Kansas City, Mo. Oral argument by *Richard P. Hutchison.*

On behalf of the intervenors-defendants-appellants, Parents for School Choice, et al., the cause was submitted on the briefs of *Clint Bolick, William H. Mellor III* and *Nicole S. Garnett* of the *Institute for Justice* of Washington, D.C.; *Stephen P. Hurley* of *Hurley, Burish & Milliken, S.C.* of Madison; and *Michael D. Dean* of Waukesha. Oral argument by *Clint Bolick.*

On behalf of the plaintiffs-respondents, Warner Jackson, et al., the cause was submitted on the brief of

*Steven R. Shapiro* of New York, N.Y., on behalf of American Civil Liberties Union Foundation *; Steven K. Green* of Washington, D.C., on behalf of Americans United for Separation of Church and State*; Peter M. Koneazny* of Milwaukee, on behalf of American Civil Liberties Union of Wisconsin Foundation, Inc.; and *Jeffrey J. Kassel* and *Melanie E. Cohen* of *LaFollette & Sinykin* of Madison. Oral argument by *Jeffrey J. Kassel.*

On behalf of the plaintiffs-respondents, Milwaukee Teachers' Education Association, et al., the cause was submitted on the brief of *Elliot M. Mincberg* and *Judith Schaeffer* of Washington, D.C., on behalf of People for the American Way; *Robert H. Chanin* and *John M. West* of *Bredhoff & Kaiser, P.L.L.C.* of Washington, D.C.; *Timothy E. Hawks* of *Shneidman, Myers, Dowling & Blumenfield* of Milwaukee, on behalf of Wisconsin Federation of Teachers; *Bruce Meredith* and *Chris Galinat* of Madison, on behalf of Wisconsin Education Association Council; and *Richard P. Perry* and *Richard Saks* of *Perry, Lerner & Quindel* of Milwaukee. Oral argument by *Robert H. Chanin.*

On behalf of the plaintiffs-respondents, National Association for the Advancement of Colored People, et al., the cause was submitted on brief by *James H. Hall, Jr.* of *Hall, Patterson & Charne* of Milwaukee and *William H. Lynch* of *Law Offices of William H. Lynch* of Milwaukee. Oral argument by *James H. Hall, Jr.*

Brief of amicus curiae was submitted by *Bradden C. Backer* of *Godfrey & Kahn, S.C.* and *Robert L. Gordon* of *Weiss, Berzowski, Brady & Donahue,* both of Milwaukee, on behalf of the Milwaukee Jewish Council for Community Relations and the Wisconsin Jewish Conference.

Brief of amicus curiae was submitted by *Marc D. Stern* and *Lois C. Waldman* of New York, N.Y., on behalf of the American Jewish Congress and Anti-Defamation League.

Brief of amicus curiae was submitted by *K. Scott Wagner* of *Hale & Lein, S.C.* of Milwaukee; and *James C. Geoly, Ryan D. Meade* and *Kevin R. Gustafson* of Chicago, Il., on behalf of the Center for Education Reform, American Legislative Exchange Council, CEO America, CEO Central Florida, CEO Connecticut, CEOS for Educational Change, Citizens for Educational Reform, Educational Freedom Foundation, James Madison Institute, the Jewish Policy Center, the "I Have a Dream" Foundation (Washington, D.C. Chapter), Institute for Public Affairs, Liberty Counsel, Maine School Choice Coalition, Pennsylvania Manufacturers Association, Reach Alliance, South Carolina Policy Council, Texans for School Choice, and United New Yorkers for Choice.

Before Dykman, P.J., Roggensack and Deininger, JJ.

DEININGER, J. The Milwaukee Parental Choice Program, § 119.23, STATS., as amended by 1995 Wis. Act 27, §§ 4002–4009, permits up to 15% of the student membership of the Milwaukee Public School (MPS) system to attend private schools, both sectarian and nonsectarian, at state expense. Plaintiffs brought these actions claiming that the amended program violates the First Amendment of the U.S. Constitution and various provisions of the Wisconsin Constitution. Defendants appeal the trial court's order which granted plaintiffs' motions for summary judgment and declared the amended program unconstitutional.

Because we conclude that the amended program violates the religious benefit clause of Article I, section 18 of the Wisconsin Constitution,[1] we affirm.

## BACKGROUND

The parties have stipulated to certain facts. The following background summary is taken from the agreed upon facts, including exhibits attached thereto, and with respect to certain matters, from the trial court's decision and order.

*a.   The Original Milwaukee Parental Choice Program*

The legislature enacted the Milwaukee Parental Choice Program, § 119.23, STATS., as a part of 1989 Wis. Act 336. As amended in 1993, the program permitted up to 1.5% of the pupil "membership"[2] of MPS to attend "at no charge, any nonsectarian private school located" in the City of Milwaukee, subject to certain eligibility requirements. The total pupil membership of MPS was more than 98,000 for the 1995–96 school year. Approximately 1500 pupils were permitted to participate under the original program, and as we discuss below, approximately 15,000 pupils would be eligible for the program as subsequently amended in 1995. Eligibility for participation in the program is limited to pupils from families whose income does not exceed 1.75 times the federal poverty level.

---

[1] Article I, section 18 of the Wisconsin Constitution provides in part: "[N]or shall any money be drawn from the treasury for the benefit of religious societies, or religious or theological seminaries."

[2] School district "membership" is defined in § 121.004(5), STATS.

8

A private school accepting students under the program must notify the State Superintendent of Public Instruction of its intent to participate by May 1st of the previous school year. Additionally, a private school accepting students under the program must comply with state and federal anti-discrimination laws, and with health and safety provisions that apply to public schools. Not more than 65% (originally 49%) of a private school's enrollment may consist of pupils attending the private school under the original program. In order to continue participation in the program in subsequent years, a private school must satisfy certain performance criteria, assuring that at least a certain percentage of the pupils participating in the program advance one grade level each year, maintain a certain average attendance rate, demonstrate significant academic progress, or meet parent involvement criteria established by the school.

In return for accepting students under the original program, a private school receives payments directly from the State equal to the amount of state aid per student to which MPS would be entitled under state school aid distribution formulas. The aid amount was approximately $2500 per student in the initial year of the program. The amount of state aid received by MPS is reduced by the amount of payments made to private schools under the program.

The original program called for extensive monitoring, evaluation, and reporting regarding the program and its participants. Specifically, the State Superintendent of Public Instruction was required to submit an annual report to the legislature regarding student achievement, attendance, discipline, and parental involvement for students in the program as compared to pupils enrolled in MPS district schools. The original

statute further directed the State Superintendent to monitor performance of pupils in the program and empowered him or her to conduct one or more financial and performance evaluation audits of the program. The legislative audit bureau was also directed to perform a financial and performance audit and to report to the legislature by January 15, 1995.

During the 1994–95 school year, approximately 800 pupils attended approximately twelve nonsectarian private schools under the original program. For 1995–96, there were approximately 1600 pupils attending approximately seventeen nonsectarian private schools under the program.

The original program withstood a state constitutional challenge in *Davis v. Grover*, 166 Wis. 2d 501, 480 N.W.2d 460 (1992). The supreme court determined that the original program "was an experiment intended to address a perceived problem of inadequate educational opportunities for disadvantaged children." *Id.* at 530, 480 N.W.2d at 470 (citation omitted). It concluded that the enactment of the original program did not constitute a "private or local bill" within the meaning of Article IV, section 18 of the Wisconsin Constitution; that the private schools participating in the program did not constitute "district schools" for purposes of the "district school uniformity clause," Article X, section 3 of the Wisconsin Constitution; and that sufficient safeguards existed, providing governmental control and supervision of the program, to insure that the "public purpose doctrine" was not violated.

*b. The Amended Milwaukee Parental Choice Program*

In the biennial budget bill, 1995 Wis. Act 27, §§ 4002–4009, the legislature significantly amended

10

the original program. Amendments to the program include the following:

(1) The limitation that participating private schools be "nonsectarian" was removed. *See id.* § 4002.

(2) Allowable pupil participation was increased to 7%, and eventually 15%, of the MPS pupil membership. *See id.* § 4003.

(3) The requirement for the State Superintendent's annual performance evaluation and report to the legislature was deleted, as was the superintendent's authority to conduct "one or more financial or performance evaluation audits" of the program. *See id.* §§ 4007m and 4008m.

(4) A change was made in the way state aid payments to participating private schools is administered. Instead of making the state aid for participating students payable directly to the private school of attendance, the aid is to be made payable to the student's "parent or guardian." The Department of Public Instruction (DPI) is directed, however, to "send the check to the private school," and "[t]he parent or guardian shall restrictively endorse the check for the use of the private school." *See id.* § 4006m.

(5) A limitation was placed on the amount of the per student aid payment. A participating school will receive the lesser of the MPS per student state aid or the private school's "operating and debt service cost per pupil that is related to educational programming" as determined by DPI. *See id.* § 4006m.

(6) The limitation that no more than 65% of a private school's enrollment may consist of program participants was repealed. *See id.* § 4003.

(7) A religious activity "opt-out" provision was added. A private school "may not require a pupil attending the private school under this section to par-

ticipate in any religious activity if the pupil's parent or guardian submits to the pupil's teacher or the private school's principal a written request that the pupil be exempt from such activities." *See id.* § 4008e.

The amendments to the program greatly expand not only the number of students who are allowed to participate, but also the number of private schools in the City of Milwaukee which may now accept students in the program. There are approximately 122 private schools in the city, of which approximately thirty-three are nonsectarian and approximately eighty-nine are sectarian. Approximately 84% of the pupils who attended private schools in the City of Milwaukee during the 1994–95 school year attended sectarian private schools.

Attached to the parties agreed upon statement of facts is an exhibit consisting of some 800 pages of excerpts from handbooks, mission statements, and other written materials prepared by many of the sectarian schools that indicated an intent to participate in the amended program for the 1995–96 school year. Numerous statements extracted from these materials, and quoted in the trial court's written decision and order, indicate that some of the eligible sectarian schools have an overtly religious mission, and that the sectarian aspects of their educational programs are intertwined with the teaching of secular subjects. The following statements are representative:

- "We believe our school exists to carry out the Savior's command to 'go and make disciples' (Matthew 28:19). Consequently, our school's primary reason for existence is to be a tool for bringing young souls to faith in Jesus. . . ."

- "First and foremost Garden Homes Lutheran Church conducts and maintains a Christian elementary school to assist Christian parents in the training and nurturing of their children in the Word of God."

- "In keeping with the purpose of our school, our curriculum is taught in the setting of God's Word. Religion is not only taught as a subject, but our teachers have been trained to integrate God's Word across the curriculum. . . . Our curriculum offerings place Christ as the focal point for all study."

- "The message of Jesus is taught in religion classes and other curricular areas. . . . Because of the nature of a Catholic school, religion is taught daily as part of the curriculum. Catholic values are also incorporated into all other aspects of the curriculum."

- "The Bible forms the core and center upon which all instruction is based. . . . All subjects are taught by a Christian teacher in the light of God's Word, emphasizing God's love for all men through Jesus."

- "We teach all the traditional subjects, but we teach them differently—from a Christian perspective."

The amount of state aid per pupil provided to MPS for the 1995–96 school year was approximately $3667. For the 1996–97 school year, the MPS per student aid amount was approximately $4400. These sums represent an upper limit on the amount of payments per student to private schools for each pupil in the program. The materials in the record from the sectarian schools indicate that many charge tuition that is hundreds of dollars less than what the schools deem to

13

be their actual cost of educating each student. The parties stipulated that:

> The tuition charged by at least a majority of the sectarian private schools that notified the Superintendent of Public Instruction of their intent to participate in the [a]mended [program] during the 1995–96 school year is less than the school's per-pupil operating and debt service cost and is less than the per-pupil state aid provided to MPS.

The difference between the costs incurred for educating students at the sectarian private schools and the tuition charged to parents is generally made up by subsidies from the affiliated parishes and congregations.

The parties further stipulated that under the amended program:

> [T]he State does not prohibit the participating sectarian private schools from using funds received by the school for any purpose the school deems appropriate, including, among other things, the payment of salaries and expenses of employees affiliated with the school's religious mission, the purchase of literature and other materials identified with the school's religious mission, and the maintenance and construction of facilities used for religious purposes.

Prior to the injunction which suspended implementation of the amended program, some 4000 MPS pupils had applied to attend private schools under the amended program.

### c.  The Litigation

#### 1.  The Parties.

Plaintiffs Warner Jackson, et al., are citizens and taxpayers of the State of Wisconsin. These plaintiffs include parents and members of the clergy from diverse religious and ethnic backgrounds, many of whom have children enrolled in the MPS. They commenced an action challenging the amended program with respect to the inclusion of sectarian private schools. These plaintiffs will be referred to as the Jackson plaintiffs.

Plaintiffs Milwaukee Teachers' Education Association, et al., consist of teachers and other employees of MPS, parents of pupils enrolled in MPS or another public school system in Wisconsin, a member of the clergy, and various organizations that represent the individual plaintiffs. These plaintiffs commenced a separate action challenging the provisions of the amended program, and their action was consolidated with the Jackson plaintiffs' action. These plaintiffs will be identified as the MTEA plaintiffs.

Plaintiffs National Association for the Advancement of Colored People, et al., filed a later, separate action challenging the amended program. The NAACP plaintiffs raised some of the same challenges as the first two plaintiff groups, but brought an additional claim that the amended program also violates the equal protection provisions of the United States and Wisconsin Constitutions. Their action was consolidated with the first two actions, although further proceedings on the equal protection claim were stayed by the trial court. These plaintiffs will be identified as the NAACP plaintiffs.

Defendant John Benson is the Superintendent of Public Instruction for the State of Wisconsin. Defendant Department of Public Instruction (DPI) is the administrative agency of the State through which

15

funding for the Milwaukee Parental Choice Program is directed, and to which are delegated various supervisory and administrative responsibilities with respect to the program. These defendants will be identified as the State defendants.

Intervening defendants Marquelle Miller, et al., are pupils, and the parents of pupils, who seek to participate in the amended program. They were granted leave to intervene and participate as defendants in the action. In addition to defending the amended program against the challenges raised in the consolidated actions, the Miller defendants claim that their rights to freely exercise their religions under the United States and Wisconsin Constitutions would be abridged if the amendments to the program are invalidated. These defendants will be identified as the Miller defendants.

Annette Polly Williams is a representative to the Wisconsin State Assembly for the Tenth District, in which numerous participants in the program and potential participants in the amended program reside. Representative Williams authored the original program and certain of the 1995 amendments at issue here. Parents for School Choice is an organization created to mobilize public support for an expansion of the program. Also included as intervenors with this group are parents of pupils who seek to participate in the amended program. These parties were granted leave to intervene as defendants and will be referred to as the PSC defendants.

Except where necessary to identify issues or arguments unique to a particular party, all plaintiffs in the consolidated actions will be referred to, collectively, as the challengers, and all defendants as the State.

2.  Procedural History.

16

The Jackson and MTEA plaintiffs filed the two original actions in August 1995. The supreme court then granted leave to commence an original action in that court and entered a preliminary injunction staying the implementation of the amended program, specifying that the pre–1995 provisions of the original program were unaffected. Following oral argument, the supreme court announced that it was deadlocked three to three on the constitutional issues, and it dismissed the petition, effectively remanding the case to the Dane County Circuit Court for further proceedings. Following remand, the trial court partially lifted the preliminary injunction, thereby allowing all of the 1995 amendments to be implemented *except* participation by sectarian schools.

The parties filed cross-motions for summary judgment. The trial court denied the State's motions for summary judgment; granted the challengers' motions for summary judgment; and ordered "the State of Wisconsin . . . to terminate the amended Milwaukee Parental Choice Program," but stayed its order until the close of the 1996–97 school year. Specifically, the trial court concluded that the amended program violates Article I, section 18 of the Wisconsin Constitution because its primary effect "is to benefit the religious missions of the elementary and secondary religious schools and because it compels Wisconsin taxpayers to support places of worship without their consent." The trial court also ruled that the amended program was a private or local bill that had been enacted in violation of the restrictions of Article IV, section 18 of the Wisconsin Constitution.[3] The court further concluded that

---

[3] "No private or local bill which may be passed by the legislature shall embrace more than one subject, and that shall be expressed in the title." WIS. CONST. art. IV, § 18.

the amended program, insofar as it included sectarian private schools, violates the Wisconsin public purpose doctrine. Finally, the trial court rejected the claim that the expanded program violates Article X, section 3 of the Wisconsin Constitution.[4] The trial court did not reach the First Amendment claim because it invalidated the amended program on state constitutional grounds.

The State appeals the trial court's order terminating the amended program.

## ANALYSIS

We are an error correcting court. *State v. Schumacher,* 144 Wis. 2d 388, 407, 424 N.W.2d 672, 679 (1988). Our role is not to pass judgment on the wisdom of the amended program as an instrument of public policy aimed at improving educational opportunities for children from low income families in the City of Milwaukee. Nor is it primarily our role to develop and declare Wisconsin constitutional law regarding the matters argued by the parties in this case. *See Cook v. Cook,* 208 Wis. 2d 166, 189–90, 560 N.W.2d 246, 255–56 (1997). Rather, our responsibility is to determine whether the trial court reached a result that is consistent with the text of the Wisconsin Constitution, and if necessary, the U.S. Constitution, and with existing precedents interpreting the provisions at issue. We conclude that the trial court reached such a result.

---

[4] "The legislature shall provide by law for the establishment of district schools, which shall be as nearly uniform as practicable, . . . and no sectarian instruction shall be allowed therein . . . ." WIS. CONST. art. X, § 3.

The parties requested that we expedite consideration of this appeal, and we agreed to do so. The parties argued the case shortly after briefing was completed, and this decision was issued within the month following oral argument. The parties submitted briefs which cumulate to more than 365 pages, not including appendices and the briefs of *amici curiae*. In order to honor our commitment to timely dispose of this appeal, we cannot specifically address each argument raised in the various briefs. To the extent that the challengers have raised issues or arguments not addressed in this opinion, we have concluded that they are not necessary to our disposition. To the extent that any arguments raised by the State remain unaddressed, we have concluded that those arguments do not persuade us that a different disposition is warranted.

### a. Standard of Review

The order under review grants summary judgment on stipulated facts. The issue is the constitutionality of a state statute. This appeal, therefore, involves questions of law which we decide de novo. *State v. Post*, 197 Wis. 2d 279, 301, 541 N.W.2d 115, 121 (1995). The legislative enactment under review enjoys a presumption of constitutionality, and although the issue is one of law, the challengers are deemed to bear the burden "to prove" the statute unconstitutional "beyond a reasonable doubt." *Id.* (Citation omitted.)

The State argues that the present actions mount a "facial" challenge to the amended program because the challengers seek to have the 1995 amendments to § 119.23, STATS., enjoined *in toto*, rather than just in certain applications. Thus, the State, citing *United States v. Salerno*, 481 U.S. 739, 745 (1987), argues that

19

the challengers' burden is to show unconstitutionality in all applications, otherwise the amended program "must be left in place" to the extent that it has constitutional applications. However, except for a footnote suggesting that students might constitutionally attend sectarian private schools where the state payment for a student in the amended program does not exceed the tuition charged for a non-program student, the State has not articulated a rationale that would allow us to declare, on this record, that the amended program "must be left in place" as to some applications.

The State's reliance on certain language in *State ex rel. Warren v. Nusbaum (Nusbaum II)*, 64 Wis. 2d 314, 322–23, 219 N.W.2d 577, 582 (1974), for support of its "partial validity" argument is misplaced. The supreme court commented that constitutional infirmities under the statute there held valid "may arise" and would have "to be determined on . . . individual facts." *Id.* But this statement follows the court's conclusion that the posture of the case before it, like this one, required it to analyze the claims made as a facial challenge to the statute:

> Since this action is before this court on the pleadings and stipulation of facts, our decision is necessarily limited thereto. Under the facts we can only determine whether [the statute] is unconstitutional on its face.

*Id.* at 322, 219 N.W.2d at 582.

The amended program is quite specific as to the students and schools that may participate, how funding is determined and paid, and what restrictions and limitations apply. The agreed upon facts, with attachments, describe the sectarian private schools that have stated an intent to participate. The essential contours

of the amended program are well established in the record, and it is the constitutionality of the program as described in this record that we must determine. Had the legislature wished to limit the amended program to certain applications it could have done so, but did not. Like the supreme court in *Nusbaum II*, we can only evaluate the program as enacted and as described in the stipulated record before us.

   *b. Article I, section 18 of the Wisconsin Constitution*

   We begin by analyzing whether the amended program violates the prohibition against state expenditures for the benefit of religious societies or seminaries contained in Article I, section 18 of the Wisconsin Constitution. We begin with this issue, first, because the trial court devoted a major part of its analysis to this issue in its decision and order, and the parties have done likewise in their briefs and oral arguments to this court. Second, beginning our analysis with the state constitutional issue enhances the economy of our effort. The Establishment Clause of the First Amendment allows "more flexibility of interpretation" than does Article I, § 18. *State ex rel. Reynolds v. Nusbaum (Reynolds)*, 17 Wis. 2d 148, 165, 115 N.W.2d 761, 770 (1962). Thus, a conclusion that the program fails under Article I, § 18 will obviate a separate First Amendment analysis. *See State v. Miller*, 202 Wis. 2d 56, 62–66, 549 N.W.2d 235, 238–39 (1996). By the same token, a conclusion that the program passes muster under the state religious benefit clause would compel the same conclusion with respect to the Establishment Clause of the First Amendment, with little, if any, additional analysis being required.

21

Notwithstanding the fact that the provisions of Article I, § 18 have been deemed by our supreme court to be less flexible than their federal counterparts in the First Amendment, the State argues that we must import and apply federal Establishment Clause jurisprudence to our analysis of the Wisconsin provisions. If we do so, the State claims that we must arrive at the conclusion that the amended program violates neither constitution because its primary effect is to enhance educational opportunities for disadvantaged students, and any benefit to religion is indirect and incidental. We have no quarrel with the proposition that we may look for guidance to analyses employed by the United States Supreme Court in Establishment Clause cases, however:

> Some questions cannot be fully illuminated by the light of federal jurisprudence alone, but may require examination according to the dictates of the more expansive protections envisioned by our state constitution.

*Miller*, 202 Wis. 2d at 64, 549 N.W.2d at 239.

We thus begin by reviewing the text of Article I, § 18, and proceed next to our supreme court's interpretations of its provisions. Even before other authority is consulted, it is apparent that the authors of the Wisconsin Constitution intended to much more specifically curtail what the State may do in its interactions with religion than did the drafters of the Bill of Rights. In lieu of the curt directive to "make no law respecting an establishment of religion, or prohibiting the free exercise thereof" contained in the First Amendment, the state text provides as follows:

22

> The right of every person to worship Almighty God according to the dictates of conscience shall never be infringed; nor shall any person be compelled to attend, erect or support any place of worship, or to maintain any ministry, without consent; nor shall any control of, or interference with, the rights of conscience be permitted, or any preference be given by law to any religious establishments or modes of worship; *nor shall any money be drawn from the treasury for the benefit of religious societies, or religious or theological seminaries.*

WIS. CONST. art. I, § 18 (emphasis supplied).

That this language goes significantly further than the First Amendment in its prohibition of state support or benefit for religion has been settled law since *State ex rel. Weiss v. District Board of School District No. Eight of Edgerton*, 76 Wis. 177, 44 N.W. 967 (1890), decided some forty years after the adoption of the Wisconsin Constitution:

> Wisconsin, as one of the later states admitted into the Union, having before it the experience of others, and probably in view of its heterogeneous population, . . . has, in her organic law, probably furnished a more complete bar to any preference for, or discrimination against, any religious sect, organization or society than any other state in the Union.

*Id.* at 207–08, 44 N.W. at 977. (The quotation is taken from a concurring opinion of Cassoday, J., to whom the court's opinion delegated the task of addressing Article I, § 18. It "thus represents the opinion of the court." *Reynolds,* 17 Wis. 2d at 165 n.3, 115 N.W.2d at 769.) The principle enunciated in this passage from *Weiss* is as valid today as it was a century ago, having been

23

quoted with approval not only by the *Reynolds* court in 1962, but again last year in *Miller,* 202 Wis. 2d at 65, 549 N.W.2d at 239.

The *Weiss* court concluded that reading the King James version of the Bible to students attending a City of Edgerton public school violated the "religious benefit" clause of Article I, § 18. The court interpreted "seminary" as used in the state constitution to mean a school, and it concluded further that:

> The thing that is prohibited is the drawing of any money from the treasury for the benefit of any religious school. If the stated reading of the Bible in the school as a text-book is not only, in a limited sense, worship, but also instruction, as it manifestly is, then there is no escape from the conclusion that it is religious instruction; and hence the money so drawn from the state treasury was for the benefit of a religious school, within the meaning of this clause of the constitution.

*Weiss,* 76 Wis. at 215, 44 N.W. at 980. (The court also held that the Bible readings violated the "compelled support" clause of Article I, § 18, which we discuss below, and the Article X, § 3 prohibition against sectarian instruction in the district schools.) *See id.* at 203–16, 44 N.W. at 976–80.

If reading a Bible to students in the Edgerton Public School converted it into a "religious seminary," for the benefit of which money had been improperly drawn from the state treasury, we fail to see how a different conclusion may be reached with respect to state payments received by sectarian schools under the amended program. The religious missions of many of these schools, and the expressed, purposeful infusion of religion into their curricula, make them religious semi-

24

naries within the meaning of Article I, § 18. *See Reynolds,* 17 Wis. 2d at 156, 115 N.W.2d at 765 (primary and secondary schools operated by religious organizations or sectarian groups, where some religious instruction is given, are "religious seminaries"). Unless the *Weiss* holding has been narrowed or abandoned, or unless the fact that state checks sent to sectarian schools under the amended program are made payable to the parents of participating students mandates a different result, we are compelled by *Weiss* to invalidate the amended program. As we discuss below, we conclude that the Article I, § 18 analysis in *Weiss* is still good law, and that the amended program cannot be convincingly distinguished.

Our conclusion is fortified by *State ex rel. Reynolds v. Nusbaum,* 17 Wis. 2d 148, 115 N.W.2d 761 (1962). The supreme court there reviewed the constitutionality of a state law "to require certain public school boards to furnish transportation to nonpublic school pupils and . . . to require payment of state aids to these school districts on account of such transportation." *Id.* at 150, 115 N.W.2d at 762. The U.S. Supreme Court had previously sustained a similar New Jersey provision against a First Amendment challenge. *See Everson v. Bd. of Educ. of Ewing,* 330 U.S. 1 (1947). The supreme court, however, expressly rejected an invitation to "adopt the construction of [Article I, § 18] of our constitution which the [*Everson* court] placed upon" the Establishment Clause of the First Amendment. *Reynolds,* 17 Wis. 2d at 164, 115 N.W.2d at 769. Instead, the court, relying in part on *Weiss,* concluded that the provision of public funds for the transportation of students attending private, sectarian schools violated Article I, § 18. *Id.* at 165–66, 115 N.W.2d at 770.

Although the law reviewed in *Reynolds* referred only to pupils attending "nonpublic schools," the stipulated facts before the court allowed it to conclude that "the private schools which stand to benefit from the act are the parochial schools" and that "the benefit conferred is in reality one confined to those religious groups which operate parochial schools." *Id.* at 158, 115 N.W.2d at 766. The same can be said of the amended program under 1995 Wis. Act 27. Over 70% of the private schools eligible for the amended program are sectarian. The thirty-three nonsectarian schools eligible to participate in the amended program would have been eligible under the original program prior to the enactment of 1995 Wis. Act 27. Whatever benefit to private schools is conferred by the amendments in the Act, is "in reality one confined to those religious groups which operate" the eighty-nine sectarian schools that became eligible to participate as a result of the passage of the amended program. *Id.*

The public funds involved in *Reynolds* were not to be paid directly to sectarian schools, or even to these schools by way of restricted payments to the parents of pupils attending them. Rather, the law simply directed public school districts to provide transportation for private school students, via the "regular routes approved for the public school bus," to "the public school which they are entitled to attend." *Id.* at 153 n.1, 115 N.W.2d at 763 (quoting § 40.53(1), STATS., as amended by Laws of 1961, ch. 648). Nonetheless, the *Reynolds* court found a benefit to not only those sectarian schools that were then paying for the transportation of their students, but also to sectarian schools, generally, which stood to "gain through increased enrollment," stating that "an increase of enrollment is a benefit to these

parochial schools." *Id.* at 156–57, 115 N.W.2d at 765 (citations omitted).

It seems clear that the sectarian schools participating in the amended program will experience increased enrollment. Except for students below grade 4, students may only participate in the amended program if they were *not* previously attending private schools other than under the program. Section 119.23(2)(a)2, STATS., as amended by 1995 Wis. Act 27, § 4002. The increase from 1500 to 15,000 in the number of pupils allowed to participate, with some 4000 having already applied for participation prior to the suspension of implementation of the amended program, virtually guarantees that many of the eighty-nine sectarian schools eligible to participate in the amended program will experience enrollment increases.

More significant than enrollment increases, however, is the benefit sectarian schools derive from the receipt of state funds which they may expend for any sectarian or nonsectarian educational purpose. These unrestricted payments cannot, under *Reynolds,* be deemed anything other than a benefit to the sectarian schools participating in the amended program. *See also State ex rel. Warren v. Nusbaum (Nusbaum I),* 55 Wis. 2d 316, 326, 198 N.W.2d 650, 655 (1972) (to be valid, a statute must provide that state payments to sectarian university be used only for secular education). The benefit accrues whether the amount a sectarian school receives for each student enrolled via the amended program is less than or more than the tuition charged for non-program students. In the latter case, of course, an even greater benefit accrues to the religious organization operating the school since the amount of subsidization it must provide to the school is less for a program student than for non-program students.

27

The State, however, argues that even if it is inescapable that "religious seminaries" are benefited by the expenditure of money drawn from the state treasury under the amended program, it must still be upheld because state and federal precedents, subsequent to *Reynolds*, make it clear that the program is unconstitutional only if a religious benefit is the "primary effect" of the amended program. The State cites the following passage in support of its argument:

> This court has held that ". . . we cannot read [Article I, § 18] as being so prohibitive as not to encompass the primary-effect test. . . ." The applicability of the primary-effect test is to make "[t]he crucial question . . . not whether some benefit accrues to a religious institution as a consequence of the legislative program, but whether its principal or primary effect advances religion."

*Nusbaum I*, 55 Wis. 2d at 333, 198 N.W.2d at 659 (quoting *State ex rel. Warren v. Reuter*, 44 Wis. 2d 201, 227, 170 N.W.2d 790, 802 (1969) and *Tilton v. Richardson*, 403 U.S. 672, 679 (1971) (footnotes omitted)). The State's argument is somewhat undermined at the outset in that, even after applying the "primary effect" test, the *Nusbaum I* court invalidated the enactment under review. The court acknowledged the secular purpose of a legislative act to make dental education available to Wisconsin residents. The court held the Act was unconstitutional under both the U.S. and Wisconsin Constitutions, however, because the law did not restrict the application of the per-student aid paid to Marquette University to secular purposes. *Id.* at 332–33, 336–37, 198 N.W.2d at 658–61.

Nonetheless, we accept the State's premise that, in reviewing the amended program under Article I, § 18,

we may, and perhaps even must, consult United States Supreme Court cases applying the "primary effect" test. This test is the second of three parts of the "*Lemon* test":

> First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion, finally, the statute must not foster "an excessive government entanglement with religion."

*Lemon v. Kurtzman,* 403 U.S. 602, 612–13 (1971) (citation and quoted source omitted); *see Nusbaum II,* 64 Wis. 2d at 322, 219 N.W.2d at 582.

Here, as in many Establishment Clause and religious benefit clause cases, the secular purpose of the amended program is virtually conceded. The purpose of the program is to expand educational opportunities for students from low income families in the City of Milwaukee. *See Davis,* 166 Wis. 2d at 530, 480 N.W.2d at 470. No party argues on this appeal that the legislature's "primary purpose" was to funnel money from the state treasury to sectarian schools in Milwaukee; but this does not prevent such a result from being deemed a "primary effect" of the amended program. *Committee for Pub. Educ. and Religious Liberty v. Nyquist,* 413 U.S. 756, 774 (1973) (proper legislative purpose does not immunize act from further scrutiny if it has "a primary effect" to advance religion).

The Supreme Court in *Nyquist* invalidated three provisions of a New York law that: (1) made direct grants of money to private elementary and secondary schools for maintenance and repair of facilities; (2) partially reimbursed low income parents for tuition costs for their children attending private schools; and (3) provided tax deductions or credits to other parents for

children attending private schools. *Id.* at 796–98. The intended New York tuition reimbursement program for low income families closely parallels the amended program here under review. The Court concluded that this part of the New York law failed the "primary effect" test, even though state funds were sent to parents instead of directly to private schools, the "great majority" of which (85%) were sectarian. *Id.* at 768, 783. Transmittal of the state aid via the parents was deemed only "one among many factors to be considered" and did not provide "per se immunity" to the program. *Id.* at 781.

The *Nyquist* Court declined to make what it labeled a "metaphysical judgment[ ]" as to whether "*the* 'primary' effect" of the tuition reimbursement program was to "subsidize religion" or to promote "legitimate secular objectives." *Id.* at 783 n.39 (emphasis supplied). Rather, the Court concluded that the "primary effect" test required only that a reviewing court "ascertain whether [a law found to have a 'primary' effect to promote some legitimate end] also has the direct and immediate effect of advancing religion." *Id.* The Court concluded that the tuition reimbursement program failed the test:

> Indeed, it is precisely the function of New York's law to provide assistance to private schools, the great majority of which are sectarian. By reimbursing parents for a portion of their tuition bill, the State seeks to relieve their financial burdens sufficiently to assure that they continue to have the option to send their children to religion-oriented schools. And while the other purposes for that aid—to perpetuate a pluralistic educational environment and to protect the fiscal integrity of

overburdened public schools—are certainly unexceptionable, the effect of the aid is unmistakably to provide desired financial support for nonpublic, sectarian institutions.

*Id.* at 783 (footnote omitted). After completing its review of each of the three facets of the New York law, the Court concluded that:

[E]ach, as written, has *a* "primary effect that advances religion" and offends the constitutional prohibition against laws "respecting an establishment of religion."

*Id.* at 798 (emphasis supplied).

Since Article I, § 18 provides less flexibility for interpretation than does the Establishment Clause, *Reynolds*, 17 Wis. 2d at 165, 115 N.W.2d at 770, we conclude that the "primary effect" test, as applied in *Nyquist,* does not undermine our conclusion that the amended program must be set aside on state constitutional grounds. Participation in the amended program is permitted to rise to 15,000 pupils, and private schools participating in the program stand to receive upwards of $4000 per student in state payments. Total state payments under the program could thus approach $60 million. If pupil attendance at sectarian schools under the program follows the percentage of private schools eligible to participate which are sectarian (over 70%), or if it mirrors the percentage of attendance at sectarian schools among private school students in the City of Milwaukee (84%), well over $40 million in state payments could be received by sectarian schools. We thus conclude that a primary effect of the amended program is the drawing of money from the state treasury for the benefit of religious schools.

31

The State argues, however, that federal cases after *Nyquist* have moved away from *Nyquist's* broad interpretation of the "primary effect" test, and it urges us to follow these later cases. We decline to do so for three reasons. First, a present member of the Supreme Court has described the Court's "Establishment Clause jurisprudence" as being in "hopeless disarray," and we do not disagree. *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 861 (1995) (Thomas, J., concurring). Second, the cases the State would have us consult do not encompass facts nearly so close to those before us as did *Nyquist. See Mueller v. Allen*, 463 U.S. 388 (1983) (Minnesota tax deduction for educational costs incurred by students attending both public and non-public schools); *Witters v. Washington Dep't of Servs. for the Blind*, 474 U.S. 481 (1986) (state vocational rehabilitation aid used by a student to pursue religious vocation at a Christian college); *Zobrest v. Catalina Foothills School Dist.*, 509 U.S. 1 (1993) (sign language interpreter provided under Individuals with Disabilities Education Act to deaf student attending sectarian high school); and *Rosenberger*, 515 U.S. 819 (1995) (student fees at public university used to pay for printing of religiously oriented student newspaper).

Third, if we are to look at federal precedents as an aid in interpreting our state constitution, we must consult those which consider facts close at hand to the controversy before us. *Nyquist* is such a case. Even if we were to speculate that a current majority of the U.S. Supreme Court would not endorse *Nyquist's* treatment of the primary effect test, the case remains precedent unless or until it is overruled by the Court. *See Agostini v. Felton,* 117 S. Ct. 1997, 2017 (1997) (if U.S. Supreme Court precedent has application in a case but " 'appears to rest on reasons rejected in some other line of deci-

32

sions,' " lower court should follow controlling case) (quoted source omitted). (In *Agostini*, decided while the parties were briefing this appeal, the Supreme Court overruled its prior decisions striking down laws in New York and Michigan that permitted public school teachers to go into private sectarian schools to provide "supplemental, remedial instruction to disadvantaged children on a neutral basis." *Id.* at 2016. The *Agostini* majority, however, left in place a prior ruling that a Michigan program, under which the State utilized and compensated teachers employed by sectarian schools to provide certain supplemental classes in those schools, violated the Establishment Clause. *Id.* at 2016–17; *see also* 2019 n.1 (Souter, J., dissenting); *and see School Dist. of Grand Rapids v. Ball*, 473 U.S. 373, 386–87 (1985) (finding "a substantial risk that, overtly or subtly, the religious message [teachers employed by sectarian schools] are expected to convey during the regular schoolday will infuse the supposedly secular classes they teach after school.").)

Finally, we note that the trial court concluded that the amended program violated not only the religious benefit clause of Article I, § 18, but the "compelled support" clause[5] as well. The State is critical of the trial court's analysis because, according to the State, "it turns every violation of the religious benefits clause into a violation of the compelled support clause and thereby violates the fundamental principle of constitutional interpretation that related provisions in a document should be interpreted to avoid redundancy." We disagree. When interpreting a provision in a stat-

[5] "[N]or shall any person be compelled to attend, erect or support any place of worship, or to maintain any ministry, without consent . . . ." WIS. CONST. art. I, § 18.

33

ute or constitution, it is proper, and perhaps even mandatory, that a court consider the language of the entire section at issue, and even that of related sections. *See State v. Barnes*, 127 Wis. 2d 34, 37, 377 N.W.2d 624, 625 (1985).

Even though "only a small fraction of the school hours [were] devoted" to Bible reading in the Edgerton Public School, the *Weiss* court concluded that the practice rendered the schoolroom "a place of worship" within the meaning of Article I, § 18. *Weiss*, 76 Wis. at 213, 44 N.W. at 979. Since "tax-payers of the district, were compelled to aid in the . . . support of the school," the court was "very certain" that use of the school as a place of worship was "expressly forbidden by the constitution of the state." *Id.* at 213–14, 44 N.W. at 279. We conclude that the materials in the record describing the missions and methods of many of the sectarian schools eligible to participate in the amended program, show that some of them are at least as worthy of being deemed "places of worship" as was the Edgerton Public School in 1890. (E.g., "The Bible forms the core and center upon which all instruction is based. Each day is opened with a devotion followed by instruction in Christian doctrine and Bible study.") And, as we have noted, the amended program creates the potential for some $40 million or more in revenues generated from Wisconsin taxpayers to flow to these sectarian schools.

We do not find it necessary to find in the compelled support clause a separate and distinct ground for the result we reach. Our reading of that clause, however, consistent with its interpretation in *Weiss*, lends additional support to our conclusion that the amended program violates Article I, section 18 of the Wisconsin Constitution because it directs the payment of money

34

from the state treasury for the benefit of religious seminaries.

Our conclusion that the amended program must be invalidated derives chiefly from the deletion by 1995 Wis. Act 27, § 4002, of the word "nonsectarian" from § 119.23(2)(a), STATS. We conclude, however, that all aspects of the amended program, 1995 Wis. Act 27, §§ 4002–4009, must be set aside. Except for a footnote in the State defendants' reply brief, no party has asked us to sever any part or parts of the amended program from its remaining provisions. We have not, therefore, pursued a separate treatment of the various amendments to the program made in the Act. *See Waushara County v. Graf,* 166 Wis. 2d 442, 451, 480 N.W.2d 16, 19 (1992) (appellate court ordinarily will not consider or decide issues not specifically raised on appeal). Had the legislature been aware that the inclusion of sectarian schools would not withstand constitutional review, it may or may not have elected to authorize a ten-fold increase in pupil participation in the program, change the computation and administration of payments to participating schools, or eliminate the percentage enrollment caps and certain of the monitoring and evaluation requirements. *See Burlington Northern, Inc. v. City of Superior,* 131 Wis. 2d 564, 580–81, 388 N.W.2d 916, 924 (1986) (invalid provisions may not be severed when it appears legislature intended provisions to be effective as an entirety and would not have enacted valid part by itself). Should the legislature desire to amend the program to allow additional pupils to attend nonsectarian private schools, or to amend the program in other regards, it should be allowed to do so beginning with a clean slate, that being the original program as upheld in *Davis v. Grover,* 166 Wis. 2d 501, 480 N.W.2d 460 (1992).

*c. The Free Exercise Claim (Miller Defendants)*

The Miller defendants claim that the amended program cannot be invalidated because the "religious school access provided by the [amended program] is mandated by" the Free Exercise Clause of the First Amendment. They argue that the original program violated their right to freely exercise their religion because a government created benefit, public funding for attendance at private schools, was conferred in a "discriminatory manner" by excluding attendance at private sectarian schools. We disagree. We fail to see why the original program represents any more of a curtailment by the State of the Miller defendants' free exercise rights than would be the case had the original program not been enacted. *See Brusca v. Missouri ex rel. State Bd. of Educ.*, 332 F. Supp. 275, 279 (E.D. Mo. 1971), *aff'd*, 405 U.S. 1050 (1972) (state provisions to fund public schools and deny funding for sectarian schools do not violate Free Exercise Clause).

As the Jackson plaintiffs note in their brief, many state and federal programs are subject to prohibitions on the use of public funds for religious purposes. These types of restrictions serve the same function as the "nonsectarian" limitation in the original program. While we may have sympathy, as did the *Nyquist* court, "for the burdens experienced by those who must pay public school taxes at the same time that they support other schools because of the constraints of 'conscience,'" *Nyquist*, 413 U.S. at 788–89, we cannot conclude that the Free Exercise Clause is violated by a limitation designed to ensure compliance with the constitutional constraint that the State not provide a benefit to religious institutions.

*d. Disposition of Remaining Claims*

We have concluded that the trial court did not err in declaring that the amended program violates Article I, section 18 of the Wisconsin Constitution. Accordingly, we, like the trial court, find it unnecessary to address the challengers' claim that the amended program also violates the Establishment Clause of the First Amendment. By the same token, we decline to address the NAACP plaintiffs' separate claim that the amended program violates the equal protection clauses of the U.S. and Wisconsin Constitutions. The trial court stayed the equal protection claim after it ordered the consolidation of the NAACP action with those of the Jackson and MTEA plaintiffs. The NAACP plaintiffs have argued the claim on this appeal as an alternative ground upon which the amended program might be invalidated. Our disposition makes it unnecessary to address the equal protection arguments. We presume that the NAACP plaintiffs will be permitted to carry forward their arguments should this case engender further review.

We also decline to address the Article IV, § 18 (private or local bill) claim or the claim that the amended program violates Wisconsin's public purpose doctrine, even though the trial court based its invalidation of the amended program in part on these claims. Neither do we find it necessary to review the trial court's conclusion that the amended program survives an Article X, § 3 challenge ("district schools" to be uniform and free of secular instruction). Each of these claims was made regarding the original program and all were rejected in *Davis v. Grover*, 166 Wis. 2d 501, 480 N.W.2d 460 (1992). The challengers argue here that the significant expansion in the numbers of pupils and private schools allowed to participate in the amended program; the concomitant increase in state dollars committed to the

program; and the elimination of the private school percentage enrollment caps and of certain monitoring requirements, combine to call into question whether the amended program can continue to withstand the challenges brought in *Davis*.

We defer consideration of whether the amendments to the program are of such a nature and magnitude that the supreme court's conclusions in *Davis* are no longer applicable to the program. Such a review, should it become necessary, is best conducted by the same court that reviewed and sustained the original program. For us to do so here, given our disposition under Article I, § 18, would amount to little more than the rendering of an advisory opinion.

### e. The Dissent

The procedural history of this case demonstrates that there can well be fundamental and good faith disagreements among judges when called upon to assess the constitutionality of the amended program. Many, if not most, of the precedents upon which we rely, and others to which we have been referred by the parties, are split decisions of our supreme court and of the U.S. Supreme Court. Chief Justice Rehnquist has noted the difficulty which infuses Religion Clause jurisprudence as follows:

> Differences of opinion are undoubtedly to be expected when the Court turns to the task of interpreting the meaning of the Religion Clauses of the First Amendment, since our previous cases arising under these clauses, as the Court notes, "have presented some of the most perplexing questions to come before this Court."

*Nyquist,* 413 U.S. at 805 (Rehnquist, J., dissenting) (quoting Justice Powell's majority opinion at 760).

There are three principal reasons why we cannot accept the dissent's result and analysis. First, the dissent's analysis is largely based on the premise that if state payments received by a sectarian school under the amended program are limited to a school's incremental costs relating only to the program students enrolled at the school (and hence, in the dissent's view, the school is not being subsidized for costs it would otherwise have incurred), then the amended program violates neither the federal or state constitutions. We cannot agree with either the premise itself or the reading of the provisions of 1995 Wis. Act 27 which it requires as a condition precedent.

The dissent finds support for its premise in *State ex rel. Atwood v. Johnson,* 170 Wis. 251, 263–64, 176 N.W. 224, 228 (1919), which dealt principally with a public purpose doctrine challenge to the Educational Bonus Law, an act which provided educational assistance to returning World War I veterans. The dissent acknowledges that *Atwood's* treatment of the religious benefit issue is not "lengthy." Dissent at 70. In fact, the entire treatment of the religious benefit issue in the case is confined to the four conclusory sentences quoted in the dissent, a passage devoid of any citation to or analysis of the language of Article I, § 18. We agree with counsel for one of the plaintiff groups, who at oral argument commented that labeling *Atwood* as "obscure" would overstate its prominence in Article I, § 18 jurisprudence.

Moreover, the proposition that the prohibitions of Article I, § 18 are satisfied if a religious institution is simply reimbursed for costs it would not otherwise incur, with no restrictions as to the purposes of the

costs to which the reimbursement is applied, is contrary to more recent Wisconsin precedents which more rigorously analyze the religious benefit issue. The *Reynolds* court concluded that increased enrollment at sectarian schools, an effect it found to flow from public funding for transportation to the schools, by itself, constituted a benefit even if the costs being subsidized had not been previously borne by them. *Reynolds*, 17 Wis. 2d at 156–57, 115 N.W.2d at 765. And, in *Nusbaum I*, the supreme court concluded that Article I, § 18 would not be violated by "a proper statute" providing state payments to Marquette University to offset dental education costs for state residents, *Nusbaum I*, 55 Wis. 2d at 333–34, 198 N.W.2d at 659, but that such a statute *must* restrict payments to that end and not simply allow the payments to offset "operating costs" of the university. *Id.* at 326, 198 N.W.2d at 655.

The supreme court expressed similar sentiments in *Nusbaum II*, 64 Wis. 2d at 326, 219 N.W.2d at 584, where it upheld the purchase of special education services from religiously affiliated providers because the act in question did not provide "aid to the religious as opposed to the secular activities of the private institutions." Specifically, the court noted:

> [T]he legislature has gone to great lengths to insure that the inculcation of religious tenets shall not take place. [A provision in the act] provides that, upon approval by the state superintendent, the private special educational service must be one: "Whose governing board, faculty, student body and teachings are not chosen or determined by any religious organization or for any sectarian purpose."

*Id.* at 325, 219 N.W.2d at 583. By contrast, not only are the provisions of 1995 Wis. Act 27 devoid of any similar

40

limitations, but the State has stipulated that, under the amended program:

> [T]he State does not prohibit the participating sectarian private schools from using funds received by the school for any purpose the school deems appropriate, including, among other things, the payment of salaries and expenses of employees affiliated with the school's religious mission, the purchase of literature and other materials identified with the school's religious mission, and the maintenance and construction of facilities used for religious purposes.

Thus, we disagree with the dissent's conclusion that if the amended provisions are construed to limit state payments to sectarian schools to the incremental costs incurred by the schools in admitting program students, the amended program therefore satisfies Article I, § 18. Even under such a construction, the state dollars received by a sectarian school would underwrite the entire "educational programming" for participating students, without restrictions limiting the application of the funds to secular services. We also cannot accept the dissent's view that the religious activity "opt-out" provision of § 119.23(7)(c), STATS., cures the constitutional infirmities of the amended program. Dissent at 80. That some parents of students participating in the amended program may have their children exempted from religious activities at sectarian schools does not alter the fact that money drawn from the state treasury would underwrite precisely those activities for other program students.

Equally untenable, in our estimation, is the dissent's adoption of a narrowing construction of the provisions of 1995 Wis. Act 27 in order to preserve its constitutionality. The dissent would have us read the

41

amended program provisions to limit state payments to only "the cost for educational programming related solely to the Parental Choice students." Dissent at 62–64. The statutory language in question provides that the state funding per student must not exceed "an amount equal to *the private school's operating and debt service cost per pupil* that is related to educational programming, as determined by [DPI]." Section 119.23(4), STATS., as amended by 1995 Wis. Act 27, § 4006m (emphasis supplied). The language of the Act cannot sustain the dissent's proposed construction. A limitation on the per-pupil cost reimbursement to those costs associated solely with the admission of program students is not to be found in § 4006m, nor in any other provision of the amended program.

None of the parties to this appeal have proposed the construction urged by the dissent, nor have they argued that the reimbursable cost provision applicable to the amended program is ambiguous, as the dissent concludes. In fact, the parties demonstrated a shared understanding of the reimbursable cost provision when they stipulated that under the amended program, "tuition charged by at least a majority of the sectarian private schools that notified the [State Superintendent] of their intent to participate in the amended MPCP during the 1995–96 school year is less than the schools' per-pupil operating and debt service cost." While this court may do so, we have no duty to consider any issues other than those presented to us, and we create " 'real problems [by] addressing unmade claims and developing arguments for one side to a dispute.' " *Swatek v. County of Dane*, 192 Wis. 2d 47, 52 n.1, 531 N.W.2d 45, 47 (1995) (quoted source omitted).

Moreover, we are not free to judicially re-write a plainly worded statute in an effort to preserve its constitutionality. *State v. Hall*, 207 Wis. 2d 54, 82–84, 557 N.W.2d 778, 789–90 (1997). The dissent does not analyze the per-pupil cost reimbursement provision of the amended program in light of its scope, legislative history, context, subject matter and purpose, which is our customary approach when we deem a statute to be ambiguous. *See Pabst Brewing Co. v. DOR*, 130 Wis. 2d 291, 294–95, 387 N.W.2d 121, 122 (Ct. App. 1986). Rather, the dissent simply declares that the provision "describes only the costs participating schools incur due to educating the Parental Choice students." Dissent at 64. We conclude that we cannot adopt the construction of the Act urged by the dissent, because to do so would require that we "go beyond the province of legitimate construction to save it, and where the meaning is plain, words cannot be read into it or out of it for the purpose of saving" the amended program. *Hall*, 207 Wis. 2d at 82, 557 N.W.2d at 789 (citations omitted).

Our second major difference with the dissent's approach is that, by beginning with an analysis of federal Establishment Clause jurisprudence and resting its conclusions regarding Article I, § 18 on that analysis, the dissent obliterates the separate identity and vitality of the religion clauses of the Wisconsin Constitution. We fear that the dissent's approach repeats this court's error in *State v. Miller*, 196 Wis. 2d 238, 538 N.W.2d 573 (Ct. App. 1995), of "overreading" *King v. Village of Waunakee*, 185 Wis. 2d 25, 517 N.W.2d 671 (1994). *See Miller*, 202 Wis. 2d at 62–66, 549 N.W.2d at 238–39. We recognize that *Miller* involved a "freedom of conscience" claim, but the supreme court did not limit its disavowal of this court's conclusion that Arti-

43

cle I, § 18 must be construed in the same manner as the First Amendment, to the conscience clauses of § 18. The supreme court's express endorsement of the principles in *Weiss* and *Reynolds*, moreover, demonstrates once more that our supreme court deems the provisions of Article I, § 18, including the religious benefit clause, to be separate and distinct from, and less flexible than, their federal counterparts. *See Miller*, 202 Wis. 2d at 65–66, 549 N.W.2d at 239. Thus, unlike the dissent, but as we were instructed by the supreme court in *Miller*, we rest our conclusions on the language of Article I, section 18 of the Wisconsin Constitution.

Finally, we believe that the dissent misinterprets certain aspects of our analysis. The dissent asserts that we have made a factual finding, based on certain excerpts from the stipulated record, that religiously affiliated schools intending to participate in the program will purposefully infuse religion throughout their educational programs. Dissent at 77. The dissent goes on to cite excerpts from the record tending to show that some of the eligible sectarian schools do not necessarily do so, and that they provide excellent education to their students in secular subjects.

We have two responses to these assertions. First, we did not state, or even imply, that the overtly religious purposes and methods espoused by certain of the eligible sectarian schools were incompatible with excellence in the secular aspects of their programs. Second, and more importantly, the constitutional concern is that nothing in the language of the amended program restricts participating schools from using state funds to support the religious aspects of the curricula at sectarian schools, regardless of whether those aspects are a major or minor part of the educational programming.

44

On the record presented, it is clear that within the array of schools intending to participate in the amended program, there are those which emphasize their religious mission and methods. While it may be difficult to conceive of a non-secular approach to teaching mathematics, it is not so difficult to envision that history, social studies, or even certain of the natural sciences could be taught from a sectarian perspective. Just as we may not presume that all students participating in the amended program will receive pervasively religious instruction in all areas, neither may we conclude that participation will be limited to those schools whose approach is "less religious." The problem is that nothing in the language of the amended program ensures that state funding will flow only to the latter and not the former, even if statutory language could be devised that would not run afoul of "entanglement" concerns.[6]

Finally, we disagree with the dissent's characterization of our application of the compelled support clause. We do not rely on that clause as a separate and distinct ground for our holding. Rather, as we stated,

---

[6] We did not reach the third, or "entanglement," prong of the Lemon test because of our conclusion that the guidance provided under the Establishment Clause analysis in *Nyquist* shows that the amended program fails the second, or "primary benefit" test. If this case turns on "how much religion" infuses the educational programming at participating sectarian schools, as the dissent implies, then the third of the Lemon tests would be implicated. *See State ex rel. Warren v. Nusbaum (Nusbaum I)*, 55 Wis. 2d 316, 329, 198 N.W.2d 650, 657 (1972) (" '[E]ntanglement' . . . is not a matter of . . . accounting reports or budgetary controls, but rather surveillance to make sure that religion is not intermixed with the purpose served by state aid.") (footnote omitted).

we conclude that it is not only appropriate, but perhaps mandatory that we review all of the language of Article I, § 18 to aid us in our interpretation of the religious benefit clause. The compelled support clause, as it was interpreted in *Weiss*, supports our conclusion that the amended program violates the prohibition of § 18, that money not be drawn from the treasury to benefit a religious institution. (We did not, as the dissent implies, conclude that the compulsory attendance prohibition was violated, but rather the compelled taxpayer support aspect of the clause.)

## CONCLUSION

For the reasons discussed above, we affirm the trial court's order declaring 1995 Wis. Act 27, §§ 4002–4009, to be in violation of Article I, section 18 of the Wisconsin Constitution.

*By the Court.*—Order affirmed.

ROGGENSACK, J. *(dissenting)*. While the majority opinion obviously entailed much thought and effort, I believe its analysis of the constitutional questions presented by this appeal led to an erroneous conclusion, in part because it did not undertake an analysis of the Milwaukee Parental Choice Program (Parental Choice) under the Establishment Clause of the First Amendment before examining Parental Choice under the Wisconsin Constitution. If the majority had done so, I am confident it would not have concluded that Establishment Clause jurisprudence was in "hopeless disarray." Rather, it would have recognized that it provides a well articulated guide, directing where the policies that underlie the Establishment Clause are related to the issues presented by each challenge. To

begin the Article I, § 18 analysis in this case with an examination of the Establishment Clause, permits a thorough comparison of the constitutional issues presented by Parental Choice with the standards of jurisprudence necessary to an effective review. Because I conclude that Respondents have failed to meet their burden to prove Parental Choice unconstitutional beyond a reasonable doubt, I must respectfully dissent.

## DISCUSSION

### First Amendment.[1]

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." So begins the First Amendment to the United States Constitution, with words so simple to repeat, but so difficult to interpret.[2] The Establishment Clause and the Free Exercise Clause may both bear on the same state conduct. As the United States Supreme Court has repeatedly recognized, there is a tension within the religion clauses of the First Amendment

---

[1] The trial court granted summary judgment to the Respondents without addressing the First Amendment challenges. The majority opinion does so as well. However, because I conclude that Parental Choice violates neither the United States Constitution nor the Wisconsin Constitution, and because a thorough explication and understanding of Establishment Clause jurisprudence is essential to a proper analysis of Parental Choice under Article I, § 18 of the Wisconsin Constitution, the First Amendment is addressed in this dissent.

[2] The Establishment Clause of the First Amendment has been made binding on the states by the Due Process Clause of the Fourteenth Amendment. *Committee for Pub. Educ. and Religious Liberty v. Nyquist*, 413 U.S. 756, 761 n.3 (1973).

itself. The Free Exercise Clause[3] and the Establishment Clause are both written in absolute terms, yet it is impossible to completely permit the former without offending the latter. *Committee for Pub. Educ. and Religious Liberty v. Nyquist,* 413 U.S. 756, 788 (1973). As a consequence of this internal tension, states which legislate in this area are required to maintain an attitude of neutrality which neither advances nor inhibits religion. *Id.* As the Court explained, "[T]he basic purpose of these provisions . . . is to insure that no religion be sponsored or favored, none commanded, and none inhibited." *Walz v. Tax Comm'n of the City of New York,* 397 U.S. 664, 669 (1970).

### 1. Evolution of Establishment Clause Jurisprudence.

As in many areas of the common law, Establishment Clause jurisprudence has developed through years of court decisions which make specific that which the Constitution provides only in general terms. In *Lemon v. Kurtzman,* 403 U.S. 602 (1971), the Supreme Court set out the general structure of the analysis which it has used in Establishment Clause cases since *Lemon*:

> First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion;

---

[3] The Miller defendants base their participation in this lawsuit on the Free Exercise Clause when they argue that without the inclusion of sectarian schools in Parental Choice, their First Amendment rights are violated. Because I conclude that the Milwaukee Parental Choice Program, which permits education in a sectarian school, is constitutional, I do not reach their argument.

finally, the statute must not foster "an excessive government entanglement with religion."[4]

*Id.* at 612–13 (citations omitted). However, while the principles enunciated in *Lemon* remain well settled, the explication of those principles in varying factual situations shows that a bright line test for Establishment Clause challenges is not possible. In part, this is true because our nation's history has never been one in which the church and the state were completely and absolutely separated. As Justice Powell points out in *Nyquist*, "[i]t has never been thought either possible or desirable to enforce a regime of total separation, and as a consequence cases arising under these Clauses have presented some of the most perplexing questions to come before this Court." *Nyquist*, 413 U.S. at 760. What the First Amendment requires by way of analysis is a careful examination of the law challenged on establishment grounds to determine whether it furthers the three evils which the Establishment Clause was designed to prevent: state financial support of religion, state sponsorship of religion and the active involvement of the state in religious activity. *Walz*, 397 U.S. at 668.

There have been numerous Establishment Clause challenges to state laws touching upon education. As those challenges have arisen in the context of varying factual patterns, the general contours of the *Lemon* test have been defined more clearly. For example, in *Mueller v. Allen*, 463 U.S. 388 (1983), the Court dismissed a challenge to a Minnesota statute which allowed a deduction for state income taxes for the

---

[4] This form of analysis will hereinafter be referred to as "the *Lemon* test," with the recognition that it provides a framework for the constitutional analysis of varying issues.

49

expenses that parents of school children actually incurred[5] for textbooks, tuition and transportation. It was acknowledged that the great bulk of the deductions would go to the parents of those students who attended private schools because public school students were provided free textbooks, tuition and generally free transportation as well. Additionally, ninety-five percent of the private school students attended schools that were sectarian. *Id.* at 391.

The secular legislative purpose of ensuring that the state's citizenry be well educated was clear in *Mueller*. Therefore, the bulk of the Court's decision focused on the second element of the *Lemon* test, that of determining whether the principal or primary effect of the statute was one which neither advanced nor inhibited religion. At the start of its analysis, the Court confirmed that "[o]ne fixed principle in this field is our consistent rejection of the argument that 'any program which in some manner aids an institution with a religious affiliation' violates the Establishment Clause." *Mueller*, 463 U.S. at 393 (citation omitted). Key to the Court's upholding the constitutionality of the statute was its religious neutrality, where the beneficiaries of the statute were defined on a religiously neutral ground (*i.e.*, school children) and where no state payments were made directly to any religious schools. The Court recognized that financial assistance provided to parents would ultimately have some economic effect comparable to that of state aid given directly to the schools attended by their children, but it found decisive

---

[5] This question was reserved in Nyquist where the payments to parents were not based on the actual expenses they incurred, but instead were pre-set stipends "occasioned by the growing financial plight of such nonpublic institutions." *Nyquist*, 413 U.S. at 792.

that the only way in which those sectarian schools could benefit was as the result of "private choices of individual parents of school-age children." *Id.* at 399. Therefore, removing the state from the decision-making process about whether the children would attend sectarian institutions was material to avoiding the three evils the First Amendment was designed to prevent.

In *Witters v. Washington Dep't of Servs. for the Blind*, 474 U.S. 481 (1986),[6] a challenge was made to permitting a particular student to participate in a program which provided public funds for special education and/or training in a profession, business or trade, in order to assist visually handicapped persons overcome vocational handicaps and to obtain the maximum degree of self-support and self-care of which they were capable. Witters was suffering from a progressive eye condition which made him eligible under the act, but he was attending Inland Empire School of the Bible, a private Christian college in Spokane, Washington where he studied the Bible, ethics, speech and church administration in an effort to equip himself for a career as a pastor, missionary or youth director. The state denied him assistance because the monies that would have been provided would have passed through him to a religious school. Witters brought suit in state court for a review of the administrative decision denying him aid. When the state courts affirmed the denial of aid, he appealed to the Supreme Court, which reversed. Justice Marshall, writing for the Court, began with the

[6] The scholastic aid survived an Establishment Clause challenge, but on remand, the Washington Supreme Court held it unconstitutional under the state constitution. *Witters v. Washington Dep't of Servs. for the Blind*, 771 P.2d 1119 (Wash. 1989), *cert. denied*, 493 U.S. 850 (1989).

same basic principle used in *Mueller* when he stated that:

> It is well settled that the Establishment Clause is not violated every time money previously in the possession of a State is conveyed to a religious institution. For example, a State may issue a paycheck to one of its employees, who may then donate all or part of that paycheck to a religious institution, all without constitutional barrier; and the State may do so even knowing that the employee so intends to dispose of his salary.

*Id.* at 486–87. The Court also stated that on the other hand, a state may not give a "direct subsidy" to a religious school. The Court defined the question presented in *Witters* as whether the extension of the aid to Witters and then his use of that aid to support his religious education was a permissible transfer similar to the hypothetical salary donation or an impermissible "direct subsidy." *Id.* at 488. The Court concluded that the only way that a religious institution would benefit from the aid given to Witters would be through Witters' personal choice, because the State of Washington's program was made generally available without regard to the sectarian/nonsectarian, or public/non-public nature of the school at which the aid would be spent. Additionally, the Court concluded that giving money to Witters was in no way an incentive for him to undertake a sectarian education. *Id.*

Justice Powell, who was the author of *Nyquist* and concurred in *Witters*, concisely set forth his understanding of the test to be used when evaluating whether the principal or primary effect of payments made to citizens was actually state advancement of religion when he stated that "state programs that are

wholly neutral in offering educational assistance to a class defined without reference to religion do not violate the second part of the *Lemon v. Kurtzman* test, because any aid to religion results from the private choices of the individual beneficiaries." *Id.* at 490–91 (Powell, J., concurring). And, in her concurring opinion, Justice O'Connor reiterated that the aid to religion at issue in *Witters* was solely the result of a private choice. The conclusion that a private choice controlled the use of the state aid was important to her because "[n]o reasonable observer is likely to draw from the facts . . . an inference that the State itself is endorsing a religious practice or belief." *Id.* at 493 (O'Connor, J., concurring) (citations omitted). And, it is a state's promotion or restriction of religious practices which the Establishment Clause proscribes, not that of private individuals.

In *Zobrest v. Catalina Foothills Sch. Dist.*, 509 U.S. 1 (1993), the Supreme Court reviewed Arizona's refusal to provide a sign-language interpreter to a deaf student who attended a private Roman Catholic high school in Tucson, Arizona. Under federal law, and state law, Zobrest would have been entitled to an interpreter as a result of his disability. However, his request was denied because the state concluded that to provide Zobrest with an interpreter in a Catholic high school would run afoul of the Establishment Clause.

In addressing the issues for the Court, Chief Justice Rehnquist began again with a premise similar to those asserted in *Witters*, *Mueller* and *Nyquist* when he stated:

> We have never said that "religious institutions are disabled by the First Amendment from participating in publicly sponsored social welfare programs." . . . [W]e have consistently held that

government programs that neutrally provide benefits to a broad class of citizens defined without reference to religion are not readily subject to an Establishment Clause challenge just because sectarian institutions may also receive an attenuated financial benefit.

*Zobrest*, 509 U.S. at 8 (citations omitted). When the Court applied the *Lemon* test, it concluded the statute was motivated by a valid secular purpose. In analyzing the second prong of *Lemon* which requires that the principal or primary effect of the law neither advance nor inhibit religion, it reasoned that the statute provided a benefit to a class (deaf children) that was not measured by religious preference, or lack thereof, and that any benefit which a religious school would receive occurred only after Zobrest's parents chose of their own free will to place him in a pervasively sectarian environment. *Id.* at 13. Therefore, it was not the state that was endorsing religion, but Zobrest and his parents. Additionally, the Court concluded that providing an interpreter did not indirectly finance religious education by relieving the sectarian school of costs it otherwise would have borne in educating its students. *Id.* at 12.

In *Rosenberger v. Rector and Visitors of the Univ. of Virginia*, 515 U.S. 819 (1995), an Establishment Clause challenge was again made in an educational setting. There, the University of Virginia had collected fees and established a Student Activities Fund from which student groups who published newspapers or magazines could retrieve their publication costs. However, a student organization, Wide Awake Productions, which would have been otherwise entitled to publication monies from the Student Activities Fund, was denied those monies because it published a newspaper

with a Christian point of view. Wide Awake Productions challenged the University's decision and the Supreme Court agreed with Wide Awake Productions. It held that the University and the courts below had erred by:

> focusing on the money that is undoubtedly expended by the government, rather than on the nature of the benefit received by the recipient. If the expenditure of governmental funds is prohibited whenever those funds pay for a service that is, pursuant to a religion-neutral program, used by a group for sectarian purposes, then *Widmar*,[7] *Mergens*,[8] and *Lamb's Chapel*[9] would have to be overruled.

*Rosenberger*, 515 U.S. at 843. In so holding, the Supreme Court clarified that the benefit received by the recipient must be one that does not inhibit or promote religion and that what the student does with that benefit, even if it is to spend 100% of it on religion-related expenditures, as in *Witters* and *Rosenberger*, does not violate the Establishment Clause. This holding is bottomed on the understanding that forbidding

---

[7] *Widmar v. Vincent*, 454 U.S. 263 (1981) (holding that exclusion of religious groups from university's open forum policy violated the First Amendment).

[8] *Board of Educ. of Westside Community Sch. (Dist. 66) v. Mergens*, 496 U.S. 226 (1990) (holding high school which allowed student secular non-curricular activities to meet on school property was required to provide equal access to a Christian student group).

[9] *Lamb's Chapel v. Center Moriches Union Free Sch. Dist.*, 508 U.S. 384 (1993) (holding school district violated First Amendment when it denied church use of public school facilities to show film series, solely because it presented a religious view of family values).

the recipient of the benefit from spending it according to his own personal beliefs would not be religion neutral, but instead would convey a state-approved hostility toward religion. As Justice O'Connor explained:

> [It] would leave an impermissible perception that religious activities are disfavored: "the message is one of neutrality rather than endorsement; if a State refused to let religious groups use facilities open to others, then it would demonstrate not neutrality but hostility toward religion." . . . Neutrality, in both form and effect, is one hallmark of the Establishment Clause.

*Id.* at 846 (O'Connor, J., concurring) (citation omitted).

The most recent Supreme Court pronunciation on an Establishment Clause challenge in an educational context is found in *Agostini v. Felton*, 117 S.Ct. 1997 (1997). There, the Supreme Court overruled its holding in *Aguilar v. Felton*, 473 U.S. 402 (1985), and a portion of its holding in *School Dist. of City of Grand Rapids v. Ball*, 473 U.S. 373 (1985), when it held that public school teachers could provide remedial education, guidance and job counseling to eligible students within the confines of private schools, ninety percent of which were sectarian, without contravening the Establishment Clause. In so doing, the Court re-examined the following presumptions which had been operational in *Aguilar* and *Ball*:

> [That] (i) any public employee who works on the premises of a religious school is presumed to inculcate religion in her work; (ii) the presence of public employees on private school premises creates a symbolic union between church and state; and (iii) any and all public aid that directly aids the educa-

tional function of religious schools impermissibly finances religious indoctrination, even if the aid reaches such schools as a consequence of private decisionmaking.

*Agostini*, 117 S.Ct. at 2010.

The Court concluded that those presumptions were no longer valid because the Court's "understanding of the criteria used to assess whether aid to religion has an impermissible effect" had changed. *Id.* First, it concluded that allowing state-paid teachers to work in parochial schools does not always result in the impermissible effect of state-sponsored indoctrination, nor does it always constitute a symbolic union between church and state. *Id.* Rather, the neutral eligibility criteria ensure that believers and nonbelievers are treated equally under the statute. Second, the Court discarded the rule that all government aid that "directly aids" the educational function of religious schools is presumptively invalid. It concluded that when the religious institution is able to benefit from the state program only as the result of an independent choice of a citizen who is eligible for the program, the Establishment Clause is not contravened. *Id.* at 2011 (citation omitted). Third, the Court will no longer presume that when aid is provided to students at the schools of their choice, those services relieve the sectarian school of costs it would otherwise have had to spend in educating its students, even without the program under challenge. *Id.* at 2011–12. Fourth, the constitutionality of an aid program does not depend on the number of sectarian school students who will receive otherwise neutral aid under the program. *Id.* at 2013.

The Court concluded that Establishment Clause analyses should focus on the criteria used by the state

to identify the beneficiaries of an aid program because they are relevant to whether the program subsidizes religion and also to whether the criteria create a financial incentive for the recipient to undertake religious education. *Id.* at 2014. The Court reasoned that an "incentive is not present, however, where the aid is allocated on the basis of neutral, secular criteria that neither favor nor disfavor religion, and is made available to both religious and secular beneficiaries on a nondiscriminatory basis." *Id.*

### 2. *Milwaukee Parental Choice Program.*

Parental Choice was enacted to broaden the educational opportunities and increase learning for students from lower-income Milwaukee families because these students were among the lowest academic achievers in the state. The beneficiaries of Parental Choice are defined by the economic circumstances and geographic location of the family in which a school-aged child is found. In order to be eligible to participate, a child's family may have income no greater than 175% of the poverty level as determined by the federal office of management and budget, must reside in Milwaukee, and must be otherwise eligible to attend kindergarten through grade twelve.[10]

Participating private schools may be sectarian or nonsectarian. They must select their students for the program on a random basis, except that they may give preference to siblings of pupils already accepted. The participating schools must be located in Milwaukee and meet all the requisite state and federal laws and codes for accreditation. The private schools cannot require pupils attending under the program to partici-

---

[10] For a complete detail of the criteria, see § 119.23, STATS.

pate in any religious activity. That choice is left to the parents. The parents of participating students are paid "an amount equal to the private school's operating and debt service cost per pupil that is related to educational programming, as determined by the department,"[11] limited by the per-pupil amount to which the public school district is entitled under § 121.08, STATS. The checks are sent to the parent's choice of schools and can be cashed only for the cost of the pupil's "educational programming, as determined by the department." Section 119.23(4), STATS.

The case at hand presents a facial challenge to the constitutionality of Parental Choice because it seeks to strike down all possible applications of the act which created it. *Bowen v. Kendrick*, 487 U.S. 589, 600 (1988). Therefore, Respondents must establish, beyond a reasonable doubt, that there are no possible applications or interpretations of the statute which would be constitutional. *United States v. Salerno*, 481 U.S. 739, 745 (1987). Because the trial court granted summary judgment to the Respondents, there must also be no issues of material fact in dispute. *Lisa R.P. v. Michael J.W.*, 210 Wis. 2d 132, 141, 565 N.W.2d 179, 183 (Ct. App. 1997).

This Establishment Clause analysis begins by applying the *Lemon* test. Parental Choice easily satisfies the first prong, with the secular purpose of improving the academic achievement for children from lower-income families. However, the major concerns about the constitutionality of Parental Choice center on the second prong of the *Lemon* test.

The Respondents maintain the statute fails the primary effect analysis of *Lemon*, and thereby violates

---

[11] The amounts payable under the program are determined by the Department of Public Instruction.

the Establishment Clause. Respondents assert Parental Choice provides "direct" support to a religious activity, even if the statute were construed to be facially neutral[12] and to have a secular purpose. The Appellants counter that any support received by a religious school is "indirect" because an independent choice by a student's parent is a condition precedent to a religious school's receipt of money; and therefore, the program is constitutional. To which Respondents reply, that even indirect support may contravene the prohibitions of the Establishment Clause.

My analysis of the second prong of the *Lemon* test begins with a recognition of the basic principles of Establishment Clause jurisprudence which are relied on in *Agostini, Witters, Mueller* and *Nyquist*. First, merely because a social welfare program in some manner aids an institution with a religious affiliation, it does not necessarily follow that the program is unconstitutional. Second, the class benefited must be described without reference to religion. Third, the nature of the benefit provided must neither be hostile to religion nor provide a religious incentive. In applying the primary effect test, I utilize the directive of Justice Powell that "state programs that are wholly neutral in offering educational assistance to a class defined without reference to religion do not violate the second part of the *Lemon v. Kurtzman* test, because any aid to religion results from the private choices of individual beneficiaries." *Witters*, 474 U.S. at 490–91. *See also Agostini*, 117 S.Ct. at 2011–12 and 2014.

Here, the class of beneficiaries is defined by the income levels of the students' families and the geographic locations in which the students reside. As set

[12] The Respondents do not concede Parental Choice is neutral.

out in the statute, the beneficiaries comprise a neutral classification that has no reference to religion. The nature of the benefit provided is the opportunity for additional educational choices for the parents and students of lower-income families. The benefit neither promotes religion nor is hostile to it. Rather, it promotes the opportunity for increased learning by those currently having the greatest difficulty with educational achievement. In so doing, the State leaves the choice of the site of each child's education to his/her parents. It is constitutionally permissible under current Establishment Clause jurisprudence for parents to choose a religious education for their children, even when they are receiving financial payments from the State to fund that choice. *Zobrest*, 509 U.S. at 13; *Mueller*, 463 U.S. at 399. As the Court held in *Witters*, the Establishment Clause is not violated merely because money previously in the possession of a state is conveyed to a religious school. A parent's choice to send his or her child to a religious private school and thereafter to transfer the monies provided under the program to that school does not run afoul of the First Amendment. *See Mueller*, 463 U.S. at 399; *Witters*, 474 U.S. at 486–87; *Rosenberger*, 515 U.S. at 842; *Agostini*, 117 S.Ct. at 2016.

Furthermore, just because the majority of the schools which have applied to participate in Parental Choice are sectarian schools, it does not necessarily follow that the statute is unconstitutional. As the Supreme Court reasoned in *Agostini:*

> Nor are we willing to conclude that the constitutionality of an aid program depends on the number of sectarian school students who happen to receive the otherwise neutral aid. *Zobrest* did not turn on the

61

fact that James Zobrest had, at the time of litigation, been the only child using a publicly funded sign-language interpreter to attend a parochial school. Accord, *Mueller v. Allen,* 463 U.S. 388, 401, 103 S.Ct. 3062, 3070, 77 L.Ed.2d 721 (1983) ("We would be loath to adopt a rule grounding the constitutionality of a facially neutral law on annual reports reciting the extent to which various classes of private citizens claimed benefits under the law.").

*Agostini,* 117 S.Ct. at 2013, *citing Mueller,* 463 U.S. at 401.

However, repeatedly in cases from *Nyquist* to *Agostini,* the Court's analysis involves consideration of whether the state payments actually supplant costs the sectarian schools would have incurred, even without the program under challenge. Therefore, I consider this factor as well. Section 119.23(4), STATS., provides for state payments to parents equal to the "cost per pupil that is related to educational programming," so long as that cost is not more than the per-pupil payment received by Milwaukee Public Schools. However, § 119.23(4) is ambiguous because it is capable of being understood by reasonably well-informed persons in at least two ways. *D.S. v. Racine County,* 142 Wis. 2d 129, 134, 416 N.W.2d 292, 294 (1987). The words "cost per pupil that is related to educational programming, as determined by the department" could mean the cost for the educational programming related solely to Parental Choice students, or the phrase could mean the cost for the educational programming for all students in a given private school divided by the number of students in that school.[13] The record does not reflect whether

---

[13] The latter interpretation was urged by counsel for the Jackson plaintiffs at oral argument. Counsel for Parents for School Choice opined that Parental Choice is a remedial pro-

the latter construction would result in a larger payment to the parents, which they would then spend at a participating school, than would the former construction. And, *Agostini* teaches that courts are no longer free to presume that when aid is provided to students who attend religious schools those monies are supplanting costs the school would have had, even without the program at issue. *Agostini*, 117 S.Ct. at 2013. However, to the extent that such a construction would result in a larger payment that would supplant costs which the schools would have incurred, even without participating in Parental Choice, it must be avoided. This is consistent with the basic maxim of statutory construction which requires that a facial challenge to a statute will not succeed when a limiting construction is available that will maintain the legislation's constitutional integrity. *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973).

> It has long been a tenet of First Amendment law that in determining a facial challenge to a statute, if it be "readily susceptible" to a narrowing construction that would make it constitutional, it will be upheld.

*Virginia v. American Booksellers Ass'n*, 484 U.S. 383, 397 (1988). Therefore, I conclude that § 119.23(4), STATS., describes only the costs participating schools incur due to educating Parental Choice students.[14]

I also conclude that Parental Choice passes the third prong of the *Lemon* test because the program

---

gram, and it is only the costs the schools incur in providing those services that are paid to the parents.

[14] This interpretation does not preclude the State from paying less than this amount, as indicated by the financial caps stated in the statute.

does not require excessive state entanglement with religion under the standards established in *Agostini*. Parental Choice requires the Department of Public Instruction to determine the amount of the payment parents will receive, to confirm that the participating schools have complied with all the requisite laws and codes and that they select pupils on a random basis, exclusive of siblings already admitted, and to monitor student performance. The Legislative Audit Bureau will also perform a financial and performance evaluation audit of the program. All are tasks that will not involve the State in the religious teachings at any sectarian school. And, no Respondent argued that the statutory responsibilities of the State result in constitutional infirmity under the third prong of the *Lemon* test.

The majority contends that *Nyquist* is the Establishment Clause case whose facts most closely resemble Parental Choice; and therefore, *Nyquist*, not more current jurisprudence, determines the outcome in this case. I disagree for two reasons. First, Establishment Clause jurisprudence is an evolving legal concept, where the outlines of the structure necessary to an effective analysis of a constitutional challenge are sharpened and clarified through successive court decisions. Therefore, *Nyquist* must be interpreted and applied with current Establishment Clause jurisprudence in mind. Second, *Nyquist* is factually distinguishable in ways the United States Supreme Court has found significant.

*Nyquist* examined an act which provided stipends to lower-income families who sent their children to private schools. The stipends were capped by a percentage of the tuition paid, but the amount received was tied to whether the child attended elementary or secondary

school, not to the amount the parent paid for tuition. It also provided for tax deductions for higher-income families who did not qualify for the stipends. The deductions were also unrelated to tuition actually paid. The nonpublic schools were characterized by the Court as those which could:

> (a) impose religious restrictions on admissions; (b) require attendance of pupils at religious activities; (c) require obedience by students to the doctrines and dogmas of a particular faith; (d) require pupils to attend instruction in the theology or doctrine of a particular faith; (e) are an integral part of the religious mission of the church sponsoring it; (f) have as a substantial purpose the inculcation of religious values; (g) impose religious restrictions on faculty appointments; and (h) impose religious restrictions on what or how the faculty may teach.

*Nyquist*, 413 U.S. at 767–68. In striking down the stipends and tax deductions, the Court concluded that the act had made no effort to maintain a separation between secular and religious educational functions at the private schools. Additionally, it concluded that because the act provided unrestricted cash for the families to use, the stipends and tax deductions operated as impermissible "incentives" that provided "encouragement" to parents to send children to religious schools. *Id.* at 785–86, 791.

By contrast, Parental Choice made significant efforts to separate the secular and religious aspects of the participating schools when it stated that no student was required to participate in *any religious activity* and that the schools were required to select students on a random basis, giving preference only to siblings of students already in attendance. Additionally, the record

does not reflect that there is any religious component to hiring of faculty for Parental Choice schools. And finally, the payments received by the parents of Parental Choice students are directly tied to the cost to the school of educating Parental Choice students. Therefore, parents' use of the funds is restricted, providing no incentive for parents to send their children to sectarian schools.

In summation, I conclude Parental Choice does not violate the Establishment Clause of the First Amendment because it offers educational assistance to a class of persons (children from lower-income families) defined without reference to their religion; it provides a benefit (increased educational opportunity) that is religion neutral; any monies which eventually reach a religious institution do so only after an independent choice by a parent; and the payments made do not subsidize religious institutions for costs they would have incurred, even without participating in Parental Choice.

**Wisconsin Constitution.**

### 1. Article I, § 18.

Article I, § 18 of the Wisconsin Constitution formed two bases for the majority's conclusion that Parental Choice was unconstitutional; the benefit clause and the compelled support clause. Article I, § 18 states in relevant part:

> The right of every person to worship Almighty God according to the dictates of conscience shall never be infringed; nor shall any person be compelled to attend, erect or support any place of worship, or to maintain any ministry, without consent; nor shall

any control of, or interference with, the rights of conscience be permitted, or any preference be given by law to any religious establishments or modes of worship; nor shall any money be drawn from the treasury for the benefit of religious societies, or religious or theological seminaries.

It contains constitutional guarantees of several personal liberties bottomed on the idea of religious freedom.

Often when a statute is challenged on religious freedom grounds, it is challenged under both the First Amendment and Article I, § 18. When that occurs, the Wisconsin Supreme Court has repeatedly stated that "[w]hile words used may differ, both the federal and state constitutional provisions relating to freedom of religion are intended and operate to serve the same dual purpose of prohibiting the 'establishment' of religion and protecting the 'free exercise' of religion." *State ex rel. Warren v. Nusbaum*, 55 Wis. 2d 316, 332, 198 N.W.2d 650, 658 (1972)[15] (where the *Lemon* test was first employed by a Wisconsin appellate court in its Establishment Clause analysis); *State ex rel. Warren v. Nusbaum*, 64 Wis. 2d 314, 328, 219 N.W.2d 577, 584 (1974);[16] *King v. Village of Waunakee*, 185 Wis. 2d 25, 53–54, 517 N.W.2d 671, 683 (1994).

However, the quoted statements do not mean that the protections afforded by Article I, § 18 are identical in all respects to those provided by the First Amendment. *State v. Miller*, 202 Wis. 2d 56, 65–66, 549 N.W.2d 235, 239 (1996). And, even though it has been held that if a First Amendment provision involving religious freedom is violated, Article I, § 18 of the Wisconsin Constitution is also violated, *Nusbaum I*, 55

---

[15] This case will be referred to hereinafter as *Nusbaum I*.
[16] This case will be referred to hereinafter as *Nusbaum II*.

Wis. 2d at 333, 198 N.W.2d at 659, it does not always follow that if the First Amendment has *not* been violated, Article I, § 18 has *not* been transgressed. *Miller*, 202 Wis. 2d at 65–66, 549 N.W.2d at 239.

*Miller*, which involved a free exercise of religion challenge brought by members of the Old Order Amish faith, is an example of a difference between First Amendment jurisprudence and Article I, § 18 jurisprudence. In analyzing their claim under the Wisconsin Constitution, the Court acknowledged federal law and its past relationship to free exercise challenges under Article I, § 18, but decided not to use the current federal analysis for a free exercise challenge and instead retained the compelling state interest/least restrictive means analysis formerly used in free exercise challenges under the First Amendment.[17] However, it did not create a bright line and hold that *all* challenges to alleged restrictions of religious freedom *must always* be analyzed differently from the analyses used with parallel challenges under the First Amendment. Rather, it held that:

> *Some* questions cannot be fully illuminated by the light of federal jurisprudence alone, but may require examination according to the dictates of the more expansive protections envisioned by our state constitution.

*Id.* at 64 (emphasis added). The analysis used in *Miller* is appropriate for a free exercise challenge, but it is not applicable to the benefit clause and compelled support

---

[17] In 1990, the United States Supreme Court stopped using the compelling state interest/least restrictive means test in cases bottomed solely on a Free Exercise Clause challenge. *Employment Div., Oregon Dep't of Human Resources v. Smith*, 494 U.S. 872 (1990).

clause challenges at issue here. Therefore, I examine those challenges using the analytical framework designated by the Wisconsin Supreme Court for the benefit clause and the compelled support clause.

### a. Benefit Clause.

The Respondents' benefit clause challenge, at least in some respects, parallels an Establishment Clause challenge under the First Amendment. The benefit clause states: "[N]or shall any money be drawn from the treasury for the benefit of religious societies, or religious or theological seminaries."[18]

*State ex rel. Atwood v. Johnson*, 170 Wis. 218, 176 N.W. 224 (1919), addresses a benefit clause challenge in an educational context.[19] There, the Court considered a law which gave financial stipends to returning World War I veterans to enable them to attend any nonprofit college, vocational school, high school or elementary school in the state, including religious schools. The use of the funds by the schools was not restricted. While not articulating a lengthy reasoning process in reaching the conclusion that the act did not violate the benefit clause, the Court clearly examined whether the payments received by the schools offset the additional

---

[18] *Reynolds v. Nusbaum*, 17 Wis. 2d 148, 156, 115 N.W.2d 761, 765 (1962), interpreted the term "religious seminaries," to include parochial elementary and secondary schools (*citing State ex rel. Weiss v. District Bd. of Sch. Dist. No. 8 of the City of Edgerton*, 76 Wis. 177, 215, 44 N.W. 967 (1890)). However, the interpretation that a sectarian school is equivalent to a "religious seminary" was retreated from in *Nusbaum I*, 55 Wis. 2d at 335 n.33, 198 N.W.2d at 660 n.33.

[19] The majority opinion does not distinguish *Atwood*, yet its facts most closely resemble those presented by Parental Choice and it is still good law.

69

costs to the schools which were generated by educating the veterans. It stated:

> The contention that financial benefit accrues to religious schools from the act is equally untenable. *Only actual increased cost to such schools occasioned by the attendance of beneficiaries is to be reimbursed.* They are not enriched by the service they render. Mere reimbursement is not aid.

*Id.* at 263–64, 176 N.W. at 228 (emphasis added). As has been discussed above in First Amendment context, and as will be discussed below in Article I, § 18 challenges, the concern that a religious school not be compensated for expenses which it would have had notwithstanding the program at issue remains a part of religious freedom jurisprudence. This is so because payment of those expenses may be viewed as subsidizing religion, if the institution's use of the funds is unrestricted. *See Agostini*, 117 S.Ct. at 2011; *Nusbaum I*, 55 Wis. 2d at 327, 198 N.W.2d at 655.

In *State ex rel. Reynolds v. Nusbaum*, 17 Wis. 2d 148, 115 N.W.2d 761 (1962), the Court addressed a facial challenge to a statute which provided transportation to and from public schools for all pupils residing in a school district two or more miles from the nearest public school, regardless of whether they attended public or private schools. In coming to its conclusion that an unconstitutional benefit would be provided to parochial schools under the act,[20] the Court employed an

---

[20] The holding in *Reynolds v. Nusbaum* was overturned by the amendment of Article I to add § 23, which provides:

Nothing in this constitution shall prohibit the legislature from providing for the safety and welfare of children by providing for the transportation of children to and from any parochial or private school or institution of learning.

70

analysis which predates the use of the *Lemon* test[21] under federal or state jurisprudence, but which applied criteria very similar to the first two prongs of *Lemon*.

First, the Court in *Reynolds* directed that when confronted with a challenge under the benefit clause, "the *crucial question* is whether the benefits which the parochial schools would receive under the act are *of a category* to constitute a violation of sec. 18, art. I, Wisconsin constitution." *Id.* at 157, 115 N.W.2d at 766 (emphasis added). Second, it examined "category" in two ways: in terms of the specific benefit provided and in terms of the class to which the benefit was directed. The Court listed examples of benefits, such as police and fire protection, that did not run afoul of the benefit clause and concluded they were benefits that were neutral[22] in regard to religion. "[A]ll of these public services and facilities are provided to the public, . . . generally on a basis whereby no classification is made as to religious organizations or schools. It is this which distinguishes these benefits from those sought to be conferred by the instant act." *Id.* The Court also considered benefits given directly to religious organizations which did not apply to the public generally, such as the tax exemption given to religious or parochial school property under § 70.11(4), STATS. The Court concluded tax benefits were in a category that was neutral[23] because the class to which it applied included all nonprofit organizations, not simply those affiliated with a

---

[21] *Lemon v. Kurtzman* was decided in 1971.

[22] Although the Court did not use the term "neutral," it set up the requirement of religious neutrality, both for the specific benefit given and for the characteristics of the class of recipients, if an act was to pass constitutional muster on a benefit clause challenge.

[23] See note 18 above.

religious organization. *Id.* at 158–59, 115 N.W.2d at 766.

As part of its analysis of whether the act provided for a "category" of religiously neutral benefits, the Court found[24] that prior to the act, the parochial schools had paid part, or all, of the cost of transportation of their pupils; and therefore, it was the schools who stood to benefit financially because, by the operation of the new law, they were being relieved of costs they would have had anyway.[25] *Id.* at 156, 115 N.W.2d at 765. Therefore, the specific benefit was not neutral to religion because it subsidized the costs of the religious schools. The analysis used in *Reynolds* is very similar to the primary effect test of *Lemon*, which currently requires religious neutrality in the criteria which define the class of beneficiaries and religious neutrality in regard to the specific benefit provided. *Witters*, 474 U.S. at 490–91 (Powell, J., concurring).

However, of equal significance, when *Reynolds* is examined in light of current federal and state jurisprudence for establishment challenges, the Court concluded the act failed the equivalent of the first

[24] This factual finding of the court is grounded in the stipulation of facts provided by the parties.

[25] It also concluded the religious schools were benefited by increased enrollment. *Reynolds*, 17 Wis. 2d at 156, 115 N.W.2d at 765. Apparently this conclusion comes from the Court's assumption that in some parochial schools the parents were required to pay for some of the costs of busing and, if relieved of that expense, more parents would be likely to choose a religious education for their children than would otherwise do so. In so reasoning, it relied on *Judd v. Board of Educ.*, 278 N.W. 200, 212, 15 N.E.2d 576, 582 (1938), which has been overruled. *Board of Educ. v. Allen*, 281 N.Y.S.2d 799, 803, 228 N.E.2d 791, 793 (1967).

prong of the *Lemon* test: It didn't have a valid secular purpose. The Court explained:

> The attorney general argues that this act is sustainable on the basis that the transportation of parochial school pupils would promote their health and welfare. It could also be argued with equal plausibility that a direct grant in aid of public funds to parochial schools promotes the general welfare of pupils of such schools because it aids in their education.

*Reynolds*, 17 Wis. 2d at 160, 115 N.W.2d at 767. And lest there be any doubt that the Court in *Reynolds* did not find a valid secular purpose for passing the act, in *Warren v. Reuter*, the Court reiterated that determination:

> In *State ex rel. Reynolds v. Nusbaum* (1962), 17 Wis. 2d 148, 115 N.W.2d 761, this court did not accept the declaration of the legislature but determined the purpose of the school bus law in its "realistic operation" was to benefit the private schools rather than promote the safety of children.

*State ex rel. Warren v. Reuter*, 44 Wis. 2d 201, 212, 170 N.W.2d 790, 794 (1969).

In *Nusbaum II*, the Court upheld the constitutionality of a comprehensive act whose purpose was to provide handicapped children with special services to meet their educational needs, even when that purpose was accomplished by school boards contracting directly with religious organizations and paying them to provide educational programs for the children. In analyzing the constitutional challenges, the Court stated, "Initially it must be recognized that the mere contracting for goods or services for a public purpose with a sectarian institution is appropriate state

73

action." *Nusbaum II*, 64 Wis. 2d at 324, 219 N.W.2d at 583. This reasoning is consistent with the conclusion set forth in *Atwood*, that if the act simply allows payment for the services a religious organization provides, the money drawn from the treasury is not for the benefit of a religious organization. It is also consistent with the converse proposition stated in *Reynolds*, that if payment supplants costs a religious school would have had notwithstanding the act, it does have the primary effect of benefiting religion.

*King* provides the most recent Wisconsin Supreme Court consideration of a benefit clause challenge. There, King claimed a crèche the Village of Waunakee placed in a village park during the Christmas holiday season was unconstitutional. It was contended that village monies were used to erect and maintain the crèche, thereby bestowing a benefit on those of the Christian faith contrary to Article I, § 18. The Appellants urged the Court to conclude that *Reynolds* required a constitutional analysis for Article I, § 18 that is different from that used in Establishment Clause cases.[26] But the Court rejected that contention, and it held that, at least for a benefit clause challenge,[27] it would interpret and apply Article I, § 18 in accord with the United States Supreme Court's interpretation of the Establishment Clause. *King*, 185 Wis. 2d at 54, 517 N.W.2d at 683.

Therefore, this dissent follows the directive of *King* in analyzing this facial challenge to Parental Choice.

---

[26] In the First Amendment section of its analysis, the Court applied the Lemon test.

[27] As noted earlier, the Wisconsin Supreme Court departs from the analytical framework used in federal Establishment Clause challenges, when it reviews a free exercise challenge under Article I, § 18.

As explained above, Parental Choice passes the *Lemon* test, as that test has been explained by the United States Supreme Court. However, that conclusion does not end my analysis, contrary to what is stated in the majority opinion. Wisconsin Supreme Court decisions support my conclusion that Parental Choice does not violate the Wisconsin Constitution.

The majority agrees that the act has a valid secular purpose, but, it defines "benefit" as the money the State provides and concludes that religious schools would be "benefited" because they would be paid for the services they provide to lower-income children under the act. There are two errors in that analysis: First, by focusing on the money the State is providing, rather than on the nature of the benefit received by the children, the majority assumes that a recipient of state funds cannot choose to use state funds to purchase services from a religious institution without offending the constitution. This is an incorrect assumption under both Wisconsin and the United States constitutional jurisprudence. *Atwood,* 170 Wis. at 263–64, 176 N.W. at 228 (concluding that veterans may use state-provided dollars to attend religious schools); *Nusbaum II,* 64 Wis. 2d at 324, 219 N.W.2d at 583 (concluding that it is constitutionally permissible to use state funds to purchase goods or services from a sectarian institution); *Rosenberger,* 515 U.S. at 842 (concluding that the expenditure of governmental funds is not prohibited simply because those funds pay for a service that is sectarian in some respects); *Zobrest,* 509 U.S. at 8 (concluding that religious institutions are not disabled by the First Amendment from participating in publicly sponsored social welfare programs); and *Witters,* 474 U.S. at 488 (concluding that it is constitutionally per-

missible for a private citizen to choose to purchase a religious education with government funds).

Second, the majority assumes that when a religious school is paid, it has received public funds for the benefit of a religious seminary. This latter assumption appears to be bottomed in part on the concern that there are no restrictions on how the schools can use the monies they receive and in part on the majority's conclusion that sectarian secondary and elementary schools are "religious seminaries." However, if each school is paid no more than the cost to it of providing educational programming for Parental Choice students whom it serves,[28] no school will receive a constitutionally impermissible benefit. *Atwood*,[29] 170 Wis. at 263–64, 176 N.W. at 228 (concluding that payment for rendering a service is not a financial benefit to a religious school); *Witters*, 474 U.S. at 488 (concluding there is no constitutional impediment to a Christian college's receipt of monies provided by the government under a social welfare program). And, *Nusbaum II* clearly states, "[T]he court has not accepted the recurrent argument that all aid is forbidden because aid to one aspect of an institution frees it to spend its other resources on religious ends." *Nusbaum II*, 64 Wis. 2d at

[28] It really does not matter whether a school receives more or less than it currently charges students for tuition, so long as the amount paid does not exceed the school's cost of providing educational programming for Parental Choice students under its care.

[29] At oral argument, Respondents' counsel argued that Atwood was "obscure;" and therefore, of no value in analyzing the case at hand. I disagree. Atwood is a decision of the Wisconsin Supreme Court, bottomed on State payments that citizens could choose to use to attend religious schools. Therefore, an appellate court may not ignore it.

324, 219 N.W.2d at 583. Furthermore, as indicated in note 18 of this dissent, just because a school has sectarian ties, one cannot presume it is a "religious seminary." *Nusbaum I*, 55 Wis. 2d at 335 n.33, 198 N.W.2d at 660 n.33.

Another factor on which the majority opinion rests is the determination that the religious mission of the participating schools so infuses every aspect of instruction that state sponsored religious indoctrination is certain to occur. It concludes that "the sectarian aspects of their educational program are intertwined with the secular subjects"; and therefore, there will be a "purposeful infusion" of religion into all aspects of the education provided. This is a factual determination in regard to how religiously affiliated schools will teach secular subjects. In support of this assertion, the majority repeats some mission statements from the exhibits which were attached to the stipulated facts. However, the same documentation provides the following information which would support an opposite factual determination:

*Catholic East Elementary School*: "Children of all religions and races are admitted."

*All Saints Catholic Elementary School*: "All Saints Catholic Elementary School is proud of the broad, multi-cultural background of its students. Applicants are accepted without regard to race, creed, or ethnic heritage." (Only one religious person is listed on its staff roster.)

*Blessed Trinity School*: The staff is made up of thirteen married women, two women listed after a "Ms." designation, and three men, who are not priests or religious brothers. There is no informa-

77

tion provided about their religious beliefs or lack thereof.

"The curriculum incorporates competency based levels of instruction in the reading and math programs and appropriate grade-level instruction in language arts, science, social studies, physical education and the fine arts. The foundation of our education approach stresses the uniqueness of the individual and generates an appreciation for each child's needs and contributions."

*Marquette University High School*: "Each year 99% of graduates attend four-year colleges and universities. . . . In 1993, Marquette High School recorded 19 National Merit Semi-Finalists."

*Divine Savior Holy Angels High School*: "DSHA offers a comprehensive and challenging academic program; approximately 95 percent of our graduates attend college. . . . DSHA offers two new state-of-the-art computer labs with 62 fully-configured workstations available to students throughout the day."

Given that information, and much more contained within the exhibits attached to the stipulation of facts, it would be reasonable to infer that the children who would attend these sectarian schools and the professional educators who teach in them would focus on mathematics when they are in math class, on chemistry when they are in chemistry class, and on penmanship when that is the topic of the moment. If they had not done so in the past, the students would not have achieved the academic success shown by the exhibits.

Furthermore, the record before this court does not indicate the religious preference of the teachers of secular subjects in the private schools. Nor was any

78

information provided about the type of textbooks used to teach secular subjects. Drs. Fuller and White's report does show that for the public high schools listed in Table 18, the religious affiliation of the students who attended those schools in 1993–94, differed from that of the institution by as much as sixty percent and the exhibits reflect that children of all creeds are welcomed.

Given the conflicting factual inferences revealed by the record, I am mindful that this appeal occurs after a motion for summary judgment. On this record, a court cannot conclude, as a matter of law, that all subjects that will be taught at sectarian schools will be infused with a religious message. *Vocational, Technical and Adult Educ., Dist. 13 v. DILHR*, 76 Wis. 2d 230, 240, 251 N.W.2d 41, 46 (1977) (concluding that there must be only one reasonable inference that can be drawn from the facts presented before a factual determination may be made as a matter of law). Furthermore, a presumption that religion would be injected in secular subjects was present in *Ball*, which *Agostini* overturned, instructing that such a presumption may not be valid in each educational institution. *Agostini*, 117 S.Ct. at 2010. The Wisconsin Supreme Court has also concluded that "pervasively sectarian" is a factual determination. "The determination whether an institution is pervasively religious is to be made with regard to the entire context in which the institution operates." *State ex rel. Wisconsin Health Facilities Auth. v. Lindner*, 91 Wis. 2d 145, 158, 280 N.W.2d 773, 780 (1979). Therefore, the conclusion that a statute sponsors religious indoctrination now requires a factual record to support it. However, no conclusive factual record exists here.

And in addition, § 119.23(7)(c), STATS., requires the private schools to abide by the choice of each student's parents in regard to whether the student will participate in *any religious activity*. The statute does not limit "religious activity" to that which occurs in religion class. Parents have the choice to opt-out of *all* religious activities. Therefore, I am unwilling to presume, unsupported by a conclusive factual record, that the participating sectarian schools will attempt to violate the clear mandate of the law regarding religious activities, simply because some have a religiously focused mission statement. And, given the holding in *Agostini*, a court should not presume that state sponsored religious indoctrination or a symbolic union between the church and state occurs by virtue of the payments made to parents under the program because it is the parents who choose religion, not the State. *Agostini*, 117 S.Ct. at 2010. That is not to say that there may not be certain participating schools that are so infused with religious messages that even attendance at a mathematics class would constitute religious instruction, but this record is insufficient to determine how the instructions in secular classes are conducted. Furthermore, individual challenges to the constitutionality of the statute are not before this court. *See Tilton v. Richardson*, 403 U.S. 672, 682 (1971) (holding that in deciding on a facial constitutional challenge, it is improper to consider only limited hypothetical applications).

The majority concludes that the benefit clause challenge is controlled by *Reynolds* and *State ex rel. Weiss v. District Bd. of Sch. Dist. No. 8 of the City of Edgerton*, 76 Wis. 177, 44 N.W. 967 (1890). While I agree that each case provides guidance on the development of benefits clause jurisprudence, neither case is

dispositive of this appeal and the majority's reliance on them is misplaced.

First, Parental Choice differs from the busing at issue in *Reynolds* because all parties agree that there was a valid secular purpose underlying the passage of Parental Choice. While in *Reynolds*, the Court specifically concluded that the act was an attempt to benefit private schools rather than to promote the safety of school children.[30] Furthermore, the payments made under the Parental Choice program will pay only for the educational programming services Parental Choice students receive. They will not supplant costs that the schools would have had were it not for Parental Choice.[31] Second, later cases have retreated from the broad edicts of *Weiss* when analyzing benefit clause challenges. For example, *Nusbaum I* addresses a change in the definition of "religious seminary" stated in *Weiss*:

> On the corollary point of whether the university here is to be considered as one of the "religious or theological seminaries" in this state, we agree that the university, in all of its operations, cannot be considered as a completely secular institution. However, *Tilton*[32] lessens the reach of earlier decisions of this court[33] insofar as the first amendment is concerned, *and we accept that decision as entirely persuasive, even if not controlling, in establishing a*

[30] See discussion at 73, above.

[31] See discussion at 62–64, above.

[32] *Tilton v. Richardson*, 403 U.S. 672 (1971).

[33] *Weiss*, 76 Wis. at 215, and *Reynolds*, 17 Wis. 2d at 156, were specifically limited by Nusbaum I in regard to their conclusions that religious schools are "religious seminaries" as referenced in Article I, § 18. *Nusbaum I*, 55 Wis. 2d at 335 n.33, 198 N.W.2d at 660 n.33.

*difference based on function* between various aspects of the university operation.

*Nusbaum I*, 55 Wis. 2d at 334, 198 N.W.2d at 659 (emphasis added). Therefore, I conclude the Respondents have not met their burden to prove, beyond a reasonable doubt, that Parental Choice violates the benefit clause.

### b. Compelled Support Clause.

The compelled support clause of Article I, § 18 states, "[N]or shall any person be compelled to attend, erect or support any place of worship." The majority opinion also concludes that Parental Choice violates this clause, mainly due to *Weiss*.

"Compelled support" may be examined in terms of participation or in terms of money. In *Weiss*, it was based on both: participation in a religious activity (Bible reading) that was contrary to the beliefs of some of the students and taxpayers' financial support of the school where the Bible reading occurred. In order to examine the challenge within the words of the constitution, the Court first decided that Bible reading was "worship." *Weiss*, 76 Wis. at 213, 44 N.W. at 980. And, because that participation occurred in school, the Court concluded that the school became a "place of worship," at least for the time when the Bible reading was occurring. *Id.* In concluding that Bible reading violated the compelled support clause, it determined that because taxpayers were compelled to pay for the school through their taxes, they were being compelled to support a place of worship in violation of the religious freedoms guaranteed in Article I, § 18. *Weiss* leaves open the question of whether a school which has religious teaching during a part of its schedule is a

place of worship when secular subjects are being taught.

In *Holt v. Thompson*, 66 Wis. 2d 659, 225 N.W.2d 678 (1975), the Court examined a statute which provided for released time from public school instruction so that students could attend religious education classes. Attendance reports were required from the religious organizations on a monthly basis, as the classes were not conducted in the public schools. In this regard, the challenge focuses on compelled support, in the sense of participation. In holding the act constitutional, the Court noted that: 1) participation in religious education was only "permitted," as attendance was voluntary; 2) the parents chose whether a child would attend religious instruction, not the State; and 3) even though the State did require attendance reports, those reports were not to compel attendance at religion classes, but rather to prevent deception by students who were "heading to the local pool hall." *Id.* at 676–77, 225 N.W.2d at 683. The Court also pointed out that while there might be some application of the statute which would operate to compel a student to attend or support a place of worship, such a challenge could not be made facially to the statute as enacted. *Id.* at 677, 225 N.W.2d at 683.

Parental Choice complies with the principles of *Holt*. It does not require any parent to send his/her child to a religious school. That choice is left to the parents. It does not require participation in any religious activity. That choice is left to the parents. The participating schools are required, notwithstanding any religious affiliation which they may have, to admit students on a random basis, with the limited exception of giving preference to siblings already in attendance. Furthermore, if parents choose to send their children to

religious education classes, that is a choice that was approved by the Court in *Holt*, so long as the instruction does not take place in a public school.

Parental Choice also does not run afoul of the holdings of *Weiss* and the later cases which examine the definitions of constitutional terms found in *Weiss*. Parental Choice provides an opportunity for alternate education for children from lower-income families. The only way in which the State can do that is to give the parents money that is tied to educational opportunity. When that occurs, it does not follow that taxpayers are compelled to support a place of worship. Rather, taxpayers are supporting a social welfare program designed to increase academic achievement for those who need it most. Additionally, if one focuses on the money paid by the State to citizens for social programs rather than on the benefit the citizens receive, one could conclude that many state-funded programs are constitutionally infirm, *e.g.*, state payments for medical care delivered in a religious hospital, state payments for childcare provided in a sectarian nursery and many post secondary educational programs.[34]

Furthermore, the record presented in this summary judgment proceeding is insufficient for this court

---

[34] Section 39.435(5), STATS., provides educational talent incentive grants which may be used in sectarian institutions. Section 39.44(2), STATS., provides minority undergraduate grants which may be used in religious schools. Section 39.45, STATS., provides grants for higher education, based on need, that can be spent at any public or private nonprofit educational institution. And, § 39.46, STATS., provides for payments to Marquette Dental School, structured to meet the concerns of the Court in *Nusbaum I* where the only choice was a religiously affiliated school and the Court required certain assurances that secular and sectarian teachings would not be intermixed.

84

to conclude, as a matter of law, that the sectarian schools that are eligible to participate are so "pervasively sectarian" that it isn't possible for a parent to choose that his or her child not receive religious instruction. For example, the stipulation of facts provides there were "approximately 89" sectarian schools eligible to participate in Parental Choice during the 1995–96 school year, but the record contains materials from only 51 sectarian schools. No information is provided about the remaining 38 religious schools. There is no information provided about how secular subjects are taught or about the religious persuasion of the teachers who teach them. The factual record presented is just as capable of supporting the conclusion that many of the sectarian schools teach religion only in religion class, much as mass is said in a Catholic hospital each day, but the hospital also provides quality patient care that is not tied to any religious message, as it is the majority's conclusion that there is a "purposeful infusion of religion" in all subjects.

A complete factual record is critical to this court because *Nusbaum I* directs that we must examine the specific function at issue and the reason for the function before we can conclude whether it is sectarian or nonsectarian. For example, the function of mathematics classes in the sectarian schools and the manner in which they are being taught are questions which must necessarily enter into our consideration of whether an institution is so sectarian that even attendance at mathematics class entails religious indoctrination. *Nusbaum I,* 55 Wis. 2d at 335, 198 N.W.2d at 660. Additionally, *Nusbaum I* limits some of the sweeping language in *Weiss* and *Reynolds*, thereby giving further support to Appellants' argument that because parents can choose whether to send their children to a secta-

rian school in the first instance and can choose to exempt their children from all religious activities, Parental Choice does not result in compelled support of a place of worship.

One must not lose sight of the reason underlying the compelled support clause of Article I, § 18. It is to prevent *the State* from making pro-religion choices for its citizens. It is not to prevent parents from making pro-religion choices for their children. The State must remain neutral in regard to religion, neither preferring nor evincing hostility towards it. Parental Choice maintains that neutrality. To paraphrase Justice O'Connor in *Witters*, no reasonable observer is likely to conclude that by enacting Parental Choice, the State of Wisconsin is endorsing, promoting, compelling or preferring a religious practice or belief. Therefore, on the record before the court, I conclude Parental Choice has not been proven to violate the compelled support clause.

The majority summarizes its conclusion of a constitutional violation in the statement that the "missions and methods of many of the sectarian schools eligible to participate in the amended program, show that some of them are at least as worthy of being deemed 'places of worship' as was the Edgerton Public School in 1890." As set forth more completely above in this dissent, that statement incorporates a factual finding about how secular subjects would be taught in the sectarian schools that the record does not support. The majority also focuses on money, not on the social program at issue. Social welfare programs generally involve state funds. Therefore, it is my determination, that on this record, the Respondents have not met their burden of proving Parental Choice violates the com-

pelled support clause, beyond a reasonable doubt in all possible applications.

## 2. *Article X, § 3.*

The Respondents also challenge Parental Choice under Article X, § 3 of the Wisconsin Constitution, which states:

> The legislature shall provide by law for the establishment of district schools, which shall be as nearly uniform as practicable; and such schools shall be free and without charge for tuition to all children between the ages of 4 and 20 years; and no sectarian instruction shall be allowed therein; but the legislature by law may, for the purpose of religious instruction outside the district schools, authorize the release of students during regular school hours.

Necessary to this challenge is their assertion that any school which receives payments from parents under this program is a "district school" within the meaning of Article X, § 3. The Wisconsin Supreme Court recently addressed this contention in *Davis v. Grover*, 166 Wis. 2d 501, 480 N.W.2d 460 (1992). There, it was conclusively decided that only public schools are "district schools" and that payments directly to the schools which participated in the initial school choice plan did not transform those schools into public schools. *Id.* at 540, 480 N.W.2d at 474. While it is appreciated that there are some differences in the two school choice programs, they are not sufficient to distinguish *Davis.*

## 3. *Article IV, § 18.*

The Respondents further challenge Parental Choice as a local bill, under Article IV, § 18 of the Wisconsin Constitution, which states, "No private or local

bill which may be passed by the legislature shall embrace more than one subject, and that shall be expressed in the title." This provision was designed to: 1) encourage the legislature to devote its time to laws which affect the entire state; 2) be certain the public had the opportunity to know of the subject matter of legislation under consideration; and 3) avoid the appearance of legislative favoritism and discrimination that can occur with laws of limited applicability. *Milwaukee Brewers Baseball Club v. H.S.S.*, 130 Wis. 2d 79, 107–08, 387 N.W.2d 254, 266 (1986). Challenges based on an assertion that an act began as a local bill are first examined to determine whether the process by which the bill was passed deserves a presumption of constitutionality and then to determine whether the challenged act was a private or local bill within the meaning of Article IV. *Davis*, 166 Wis. 2d at 520, 480 N.W.2d at 466. There is a distinction between examining the constitutionality of the process which created the legislation and the substance of the law as enacted. *City of Brookfield v. Milwaukee Metropolitan Sewerage Dist.*, 144 Wis. 2d 896, 912–13, 426 N.W. 591, 599 (1988).

The process by which Parental Choice was enacted was proper. The bill was not smuggled or log-rolled through the legislature. It was thoroughly debated on the floor of the Assembly and the Senate and extensive public hearings were held in many locations, such as Milwaukee, Cedarburg, Madison, Portage and River Falls. Interests both for and against Parental Choice had ample opportunity to bring their concerns to the attention of the legislature. Therefore, I conclude that Parental Choice is presumptively constitutional and the Respondents bear the heavy burden of proving a constitutional violation beyond a reasonable doubt.

When examining whether Parental Choice began as a local bill, *Davis* directs consideration be given to: 1) whether it refers to particular people, places or things; 2) whether it involves a prohibited category under Article IV, § 31; or 3) whether it creates a closed classification. *Davis,* 166 Wis. 2d at 524–25, 480 N.W.2d at 467–68. The third concern, that of a closed class, is the focus here because only Milwaukee students are eligible at present.

The same challenge was made and decided in favor of constitutionality in *Davis.* The Respondents urge this court to reconsider the issue, notwithstanding *Davis,* because there have been changes in the statute that undermine that holding. I do not agree. The factors which controlled the Court's decision there remain, and if an appellate court is to modify the conclusions reached in *Davis* based on the changes in the current school choice program, that must be done by the Wisconsin Supreme Court. Therefore, I conclude that based on controlling precedent, Parental Choice was not a local bill.

**Public Purpose.**

The Respondents contend that Parental Choice was enacted without a valid public purpose. The public purpose doctrine requires that "public expenditures may be made only for public purposes." *Davis,* 166 Wis. 2d at 540, 480 N.W.2d at 474. "[W]hat constitutes a public purpose is in the first instance a question for the legislature to determine and its opinion should be given great weight." *Warren,* 44 Wis. 2d at 212, 170 N.W.2d at 795. And, when public funds are appropriated for use at a private institution, the program must be subject to controls and accountability requirements sufficient to guard the public interests which justify

the expenditure. *Id.* at 215–16, 170 N.W.2d at 796. "Only such control and accountability as is reasonably necessary under the circumstances to attain the public purpose is required." *Id.* at 216, 170 N.W.2d at 796.

There is no dispute that improving the academic achievement of lower-income students is a valid public purpose. Rather, the dispute centers on whether the controls are reasonable under the circumstances. I look to *Davis* for guidance in this regard. There, the Court examined controls that require: 1) the private schools to provide their students with an education that complies with § 118.165, STATS.; 2) the quality of the education in regard to student progress be subject to measurable standards; 3) parents to choose for their own children that which is most likely to promote academic achievement; and 4) the cost of the program be restricted. *Davis*, 166 Wis. 2d at 542–46, 480 N.W.2d at 475–77. The controls instituted by the legislature for Parental Choice measure up to those found sufficient in *Davis*. First, the schools must comply with all the requirements of § 118.165, STATS. Second, § 119.23(7), STATS., sets forth measurable quality standards. Third, the parents of the children are still making the choice of school for their own children, and fourth, the cost of the program is limited by the scope of its application and by the cost of providing educational programming for the Parental Choice students or the per-pupil amount allocated to Milwaukee Public Schools, whichever is less. Therefore, I conclude that Parental Choice does not violate the public purpose doctrine.

**Equal Protection.**

The NAACP Respondents request this court to conclude that its claim that Parental Choice violates the equal protection provisions of the United States

and Wisconsin constitutions remains viable and can be proceeded upon, if this court should reverse the circuit court and conclude Parental Choice is constitutional. Because the claims the NAACP made were stayed by the circuit court and because the majority opinion concludes that Parental Choice is unconstitutional, thereby giving the NAACP the relief it seeks, there is no reason to consider the matter further at this time.

## CONCLUSION

Parental Choice is a social welfare program which provides educational opportunities (a religion-neutral benefit) to children from lower-income families (a religion-neutral class). Because the money paid to the parents is equal to, and must be spent for, the costs to the participating schools of providing educational programming, the payments do not provide an incentive for parents to send their children to religious schools, rather than keeping them in Milwaukee Public Schools. Additionally, the schools receive no payments "for the benefit of" religious seminaries. The schools receive payments for the educational programming they provide to students who participate in the program.

Although parents can choose to permit their children to exercise this educational opportunity in sectarian schools, they can also choose that their children not participate in any religious activities. If certain schools were not to honor that choice, as the majority suggests may occur because of some mission statements, it does not follow that Parental Choice is unconstitutional. Rather, what follows is a recognition that those schools would not be in compliance with the act.

Furthermore, for those students whose parents choose to permit them to attend religion class, a similar choice was approved by the Wisconsin Supreme Court in *Holt*. That parents are able to make a choice which has a religious component only because of the state payments they receive, is not unique to Parental Choice. Other examples are: 1) the choice a citizen makes when he is treated in a religiously affiliated hospital, prays with the chaplain each day, and the State pays the hospital's bill; 2) the choice a parent makes to have his/her child cared for in a daycare which is operated by a religious organization, and the State pays the daycare bill; 3) the choice students make to attend sectarian colleges, and the State provides the money to permit that choice pursuant to §§ 39.435 and 39.44, STATS. Neither the federal nor the state constitution is contravened by any of these choices because the State is not advancing religion through the social welfare benefit it provides. It is the individual citizen who chooses to use a state social welfare benefit in a setting that has a religious connection. As Justice Douglas wrote, and as was quoted with approval in *King*:

> When the state encourages religious instruction . . . it follows the best of our traditions. For it then respects the religious nature of our people and accommodates the public service to their spiritual needs. To hold that it may not would be to find in the Constitution a requirement that the government show a callous indifference to religious groups. That would be preferring those who believe in no religion over those who do believe.

*King*, 185 Wis. 2d at 46, 517 N.W.2d at 680 (citing *Zorach v. Clauson*, 343 U.S. 306, 313–14 (1952)).

Because I conclude that Parental Choice neither promotes religion nor is hostile to it, but instead leaves religious choices with the parents where they are constitutionally permissible, I must respectfully dissent.